CRABTREE, J.T.C.
This local property tax case involves the tax valuation of Loew’s Glenpointe Hotel for tax years 1984 through 1987. The property is the crown jewel in an upscale development *384 complex that also includes residential condominiums, two office buildings, a parking garage and retail shops.
The assessments, including land and buildings, are as follows:
Block & Lot 1984 1985 1986 1987
3720 5 $31,095,700 $35,301,700 $30,924,300 $30,924,300
3720 6 855,600 855,600 1,044,400 1,044,400
4403 1 183,500 183,500 298,600 298,600
3712 18 169,000 169,000 206,300 206,300
$32,303,800 $36,509,800 $32,473,600 $32,473,600
The uses of the subject property, identified by block and lot, are as follows:
Block & Lot ' Use
3720 5 Hotel & Spa
3720 6 Hotel Parking Lot
4403 1 Hotel Employee Parking Lot
3712 18 HVAC Building *
* This building services the East Office Building as well as the hotel.
The Loew’s Glenpointe Hotel is a full-service, luxury-class hotel situated on a parcel of 9.27 acres. The hotel has 347 guest rooms, approximately 19,500 square feet of meeting space, two restaurants, a lounge, a lobby bar and a health club known as “The Spa at Glenpointe.”
The facility enjoys a prominent location at the interchange of Interstate Route 95 and DeGraw Avenue in Teaneck and is located exactly three miles from the George Washington Bridge. The edifice has an imposing facade finished in black anodized aluminum. It is a prominent landmark, highly visible when approached from either direction on 1-95.
The hotel opened for business on November 15, 1983. The average occupancy in 1984, the first full year of operation, was 64%, while the average room rate in that year was $82.04. The *385 occupancy increased to 70.4% in 1985, while the average room rate increased to $94.14. The average occupancy fell off slightly in 1986 to 69.6% while the average room rate continued to rise (to $98.38). In 1987 the occupancy declined to 64.8% but the average room rate increased to $104.39.
The total construction costs, both direct and indirect, for the hotel and the spa were $31,443,732. Plaintiff paid $1,052,910, exclusive of off-site improvements required by the purchase contract, for about 48 acres of vacant land which included the 9.47 acres which became the hotel site.
Plaintiff’s expert was a recognized authority on hotel and motel valuation. He has valued more than 500 lodging facilities in nearly every state in the United States over a recent 12-year span and he claims to possess hands-on knowledge and experience as an investor in hotels.
Relying exclusively on the income method, the expert estimated the true value of the hotel for tax valuation purposes as follows:
10/1/83 $17,900,000
10/1/84 18,100,000
10/1/85 21,000,000
10/1/86 27,200,000
In arriving at these value estimates the expert began with the actual income and expense for 1986, which he adjusted for a stabilized occupancy rate of 70% and room department expense of 24%. (Actual expense in that category was 27.4%.). He then posited net income for other tax years by adjusting up or down from 1986. In order to arrive at the true value of the real property itself, the expert undertook to eliminate business value and the value of the personal property.
He opined that the business value of a hotel is reflected in the compensation paid to a professional management agent to assume responsibility for daily operations of the hotel, thereby permitting the owner to maintain only a passive interest. That compensation is measured by a percentage of total hotel revenues. In this case the management agreement between the *386 owner and Loew’s Corporation, the management company, calls for a payment to Loews of 3% of total revenue for each of the first two fiscal years of operation and 3.25% of total revenues for each year thereafter. The expert utilized the percentages in the management contract as his adjustment for business value as he concluded that the contract reflected the industry norm for hotels of the subject’s size and type.
The expert made two adjustments to eliminate the value of personal property, i.e., the furniture and equipment. He achieved the return of personal property by positing a replacement reserve equal to 3% of total hotel revenues; the return on personal property was estimated by positing a rate of return approximating the interest rate on hotel mortgages for the tax years in question, which he applied to the depreciated book value of the personal property.
Thus, the income posited by the expert, after all the aforementioned adjustments, was as follows:
1984 1985 1986 1987
Stabilized net income before real estate taxes 4,392,000 $4,549,000 $4,636,000 $4,822,000
Less: income attributed to business 546,000 565,000 624,000 649,000
Personal property 1,145,000 1,220,000 1,083,000 938,000
Stabilized net income attributable to real estate $2,701,000 $2,764,000 $2,929,000 $3,235,000
The expert applied a capitalization rate to these stabilized and adjusted net income estimates to arrive at the value conclusions set forth earlier in this opinion. He developed his capitalization rate by means of the mortgage-equity band of investment *387 method, postulating a 75% mortgage position and a 25% equity position. He averred that a mortgage term of 30 years would be appropriate for a hotel of the subject’s age and quality. In selecting the appropriate mortgage interest rate for each year in issue, the expert relied upon data published by the American Council of Life Insurance (ACLI), focusing upon mortgage interest rates and constants for hotel and motel loans made by ACLI members in 1983, 1984, 1985 and 1986. He refined his analysis further by concentrating on mortgage interest rates for the third and fourth quarters of the pretax years 1983-1986. He averaged the rates for those two quarters in each year and applied the constant appropriate to a 30-year amortization schedule.
He posited a 10% cash-on-cash equity return for each year.
Finally, he applied an unweighted, unclassified assessment-to-sales ratio to the actual tax rate for each tax year in order to account for local property taxes in the capitalization rate. Thus, the expert’s capitalization rate looked like this for each year:
1984
70% mortgage, constant 13.22% 9.91%
25% equity @ 10% 2.50%
Effective tax rate 3.28% x 82.91% 2.72%
15.13%
Say 15.1 %
1985
75% mortgage, constant 13.65% 10.24%
25% equity @ 10% 2.50%
Effective tax rate 3.45% x 75.06% 2.59%
15.33%
Say 15.3 %
*388 1986
75% mortgage, constant 12.39% 9.29%
25% equity @ 10% 2.50%
Effective tax rate 3.57% X 60.38% 2.16%
13.95%
Say 14.0 %
1987
75% mortgage, constant 10.09% 7.57%
25% equity @ 10% 2.50%
Effective tax rate 3.81% X 47.34% 1.80%
11.87%
Say 11.9 %
At the trial the expert acknowledged that his appraisal treated spa income and expense incorrectly. He then made certain adjustments to reflect the fact that the spa was operated under a lease with the the hotel, not as an integral department thereof. Those adjustments led to a modification of his true value conclusions so that his value estimates for the tax years in issue became:
Tax year Value
$20,665,000 1984
20.797.000 1985
23.992.000 1986
30.696.000 1987
Defendant offered no evidence concerning the true value of the hotel.
The first issue to be addressed is defendant’s contention that the best evidence of the subject’s true value for tax assessment purposes is the actual cost of construction. Defendant argues that the hotel is a special purpose property, which can be properly valued only by the cost approach, citing Anaconda Co. v. Perth Amboy, 157 N.J.Super. 42, 384 A.2d 531 (App.Div.1978), vacated and remanded on other grounds 81 N.J. 55, 404 A.2d 1155 (1979); Pantasote Co. v. Passaic, 6 N.J.Tax 34 (Tax Ct.1983), aff’d 100 N.J. 408, 495 A.2d 1308 (1985) and *389 Transcontinental Gas Pipe Line Corporation v. Bernards Tp., 111 N.J. 507, 545 A.2d 746 (1988). Defendant’s argument must fail for four reasons.
First, the search is for the fair value of the subject property; and in that connection consideration should be given to all three approaches to value, even if one assumes the property to be special purpose in character. There is no doctrinaire approach to value. New Brunswick v. State of N.J. Div. of Tax Appeals, 39 N.J. 537, 543-544, 189 A.2d 702 (1963); Brockway Glass Company v. Freehold Tp., 10 N.J.Tax 356, 371 (Tax Ct.1989). In the instant case I find from the evidence that the income approach is the most probative of the subject’s value.
Second, there is no evidence in this case that the hotel is a special purpose property. Defendant declined to introduce an affirmative case on the hotel’s true value; the expert testified on cross-examination that in his opinion, the hotel structure could be devoted to an alternate use; and no documentary evidence introduced by either party supports a finding of special purpose.
Third, defendant argues from its premise about the cost approach that plaintiff would not sell the property for less than the cost to build it. Defendant ignores an indispensable component of market sale transactions: there are always two parties, a seller and a buyer, and each of them has a desire that conflicts with the other, namely, the price at which the property will sell for. It may be that the seller is reluctant to sell property for less than he paid to have it built. The prospective buyer, on the other hand, may be unwilling or unable, for a variety of reasons, to pay more than a certain amount, and that amount could be far less than the sellers’ actual cost of construction. “Expensive buildings are frequently sold for much less than cost as is common knowledge....” Haworth v. State Board of Tax Appeals, 132 N.J.L. 306, 308, 40 A.2d 353 (Sup.Ct.1945). See Highview Estates v. Englewood Cliffs, 6 N.J.Tax 194, 201 (Tax Ct.1983).
*390 Finally, the income approach is a viable method of appraising hotels and, in many cases, is given the greatest weight. Hall and Benton, “Hotel and Motel Valuation,” Encyclopedia of Real Estate Appraising (3 ed. 1978) at 631, 642. Knowledgeable buyers of lodging facilities generally base their purchase decisions on factors such as forecasted net income and return on investment, which are not reflected in the cost approach. Rushmore and Rubin, “The Valuation of Hotels and Motels for Assessment Purposes,” The Appraisal Journal, (April 1984) at 270, 273.
Defendant next argues that plaintiffs income approach must be rejected for failure of proof. Specifically, defendant contends that the expert’s failure to analyze other hotel properties and his reliance upon stabilized income and occupancy of the subject alone preclude a judicial determination of the fair rental value of the hotel. Defendant distinguishes the hotel valuation in this case from the valuation of a multi-family apartment property, where, our Supreme Court held, the current income scale of a large well-managed apartment project functioning with short-term leases is prima facie evidence of fair rental value. Parkview Village Assoc. v. Collingswood, 62 N.J. 21, 297 A.2d 842 (1972). Defendant argues that the labor-intensive retail business aspects of a hotel and the degree of management expertise required in a hotel operation make the presumption of Parkview Village inapposite. I cannot agree.
To begin with, resort to revenues of other hotels does not aid in the judicial quest for economic rent of the subject. For, as defendant argues, a hotel is a labor-intensive business requiring a high degree of management expertise; so that the revenues of other hotels require the same adjustments to eliminate business value as the expert made with respect to the revenues of the subject. The adjustments in the revenues of other hotels thus vitiate the probative value of those revenues.
Second, the evidence shows that the hotel is managed pursuant to an arms’-length management contract, the provisions of *391 which provided incentives to management to maximize revenues. The record also indicates that Loew’s is an experienced, expert hotel management concern.
In view of the foregoing I conclude that the subject hotel is managed in an efficient manner so as to produce the optimal net income. The principles of Parkview Village are thus applicable to the tax valuation of a hotel; and I conclude that the operating revenues of the subject hotel, as stabilized by plaintiff’s expert for all tax years under revenue, are prima facie of economic rent, subject to adjustments for business value and the value of personal property.
The next issue to be addressed is the expert’s adjustment to extract the hotel’s business value. One method of separating the real estate and business interest in hotel valuation is to extract from hotel revenues the fee paid by the owner to a management company pursuant to a management contract. See, e.g., Rushmore, Hotels, Motels and Restaurants: Valuations and Market Studies (1983) at 105-106; Nelson, Messer and Allen, “Hotel Enterprise Valuation,” The Appraisal Journal (April 1988) at 163-164. This is the technique adopted by the expert in this case. I find it to be reasonable. I also find the amounts specified in the management contract, namely, 3% of gross revenues for 1984 and 1985 and 3.25% of gross revenues for 1986 and 1987, to be reasonable.
An adjustment is in order, however, with respect to the revenues against which the management fee is measured. The management contract defines revenues to exclude gross receipts from lessees, licensees and concessionaires. The expert conceded on cross-examination that, under this definition, receipts from the spa should have been excluded from the revenue base in his calculation of the management fee. Accordingly, in adjusting for the management fee as income attributable to the business, the court will reduce the revenue base by the amount of total receipts attributable to the spa.
In light of the expert’s stabilizing technique, in which he used 1986 as the norm, the court will assume that spa revenues for *392 1984, 1985 and 1987 comprise 7.7% of total normalized revenues. Eeceipts from the spa for 1986, the normalizing year, amounted to 7.7% of total revenues.
The next issue to be addressed is the expert’s adjustment to eliminate personal property, which he effectuates by extracting both the personal property itself and the hypothetical income therefrom. He extracts the personal property by means of a 3% replacement reserve charged against hotel revenues. He extracts the income by hypothesizing a rate of return equal to the interest rate on hotel mortgages viewed as of the relevant assessing dates.
Eeplacement of personal property by the reserve method chargeable to the income of the property appraised is a generally accepted appraisal technique. American Institute of Real Estate Appraisers, The Appraisal of Real Estate (9 ed. 1987) at 450-451. It is also a reasonable way of accounting for non-taxable personal property; it does not depend upon detailed examination of book or market value of the personal property.
However, while the expert testified that the industry norm for replacement reserves was 3% to 5% of total revenues — and he chose 3% — an examination of the management contract with Loew’s indicates that, pursuant to the formula there employed, the replacement reserve amounted to 1% of revenues for all tax years in issue. As the replacement reserve is the technique used to extract the hotel’s personal property the court will adopt the reserve level actually utilized under the management contract.
In estimating the return on personal property the expert relied upon depreciated book cost of furniture, fixtures and equipment. Defendant argues that this adjustment must be rejected as the expert failed to distinguish between movables and fixtures. The difference is important, as the purpose of the adjustment is to eliminate non-taxable personal property and some fixtures in the hotel may be taxable as real property pursuant to N.J.S.A. 54:4-1, as amended by L. 1986, c. 117. Although c. 117 purports to be effective October 8, 1986, *393 section 4 thereof states that the statute applies to all court or county board proceedings pending on the date of enactment. This retroactive provision has been upheld in a recent en banc opinion of this court. Chevron, U.S.A., Inc. v. Perth Amboy, 9 N.J.Tax 205 (Tax Ct.1987). Defendant’s contention is correct. The expert admitted that he made no distinction between movable personal property (which is not taxable as real property) and fixtures, which, for the most part, may well be taxable as part of the real property under the standards established by c. 117. As the expert failed to make this critical distinction, the court cannot accept his adjustment for the income on personal property.[1]
The final items in dispute relative to hotel revenues and expenses are the treatment of spa income and expense and spa rental and common area maintenance charges.
The expert assumed, erroneously as it turned out, that the spa was a department of the hotel. It was not. The spa was operated under a lease between the hotel owner and its tenant, The Spa at Glenpointe, Inc. All the income and expense of the spa are thus attributable to the lessee, not to the hotel. Moreover, the annual rent of $325,000 payable by the lessee must be reflected in hotel income. Spa income, in the normalizing year 1986, amounted to 7.7% of total revenues, while spa expenses in that year were 17.33% of total departmental expenses. The common area maintenance (CAM) charges are on a different footing. Those charges are payable to plaintiff as the owner of the entire development of which the hotel is only one component. The court must value the hotel as though sold on the assessing dates. NJ.S.A. 54:4-23. The purchaser would be obligated to pay CAM charges to the owner of the development. Accordingly, CAM charges will not be added to hotel income as part of spa rent.
*394 Total hotel revenues, as normalized and stabilized for each tax year, with 1986 as the normalizing year, will be adjusted to reduce revenues by 7.7% in each year and expenses by 14.57%. Also, the annual spa rent of $325,000 will be added to total revenues for each year.
On the basis of the foregoing the court finds economic rent of the hotel to be as follows:
(+000)
1984 1985 1986 1987
Total revenue 17,114 17,713 18,048 . 18,757
Management fee (3%) 513 531 507 563
Return of personal property (1%) 171 177 180 188
Gross economic income after elimination of business value and value of personal property 16,430 17,005 17,327 18,006
Less expenses (70%) * 11,980 12,400 12,633 13,130
Economic net income 4,450 4,605 4,694 4,876
* After elimination of spa revenues and expenses but with addition of spa rent. The expense ratio is based upon total revenues before adjustments for business value and personal property.
The only issue remaining to be addressed is the capitalization rate. The expert, who professed to rely upon data from the American Council of Life Insurance (ACLI)[2] for all relevant periods, postulated the following capitalization rates, exclusive of the tax rate:
1984
75% mortgage (12.94% interest, constant 13.22%) 9.91%
25% equity @ 10% 2.50%
12.41%
*395 1985
75% mortgage (13.4% interest, constant 13.65%) 10.24%
25% equity @ 10% 2.50%
12.74%
1986
75% mortgage (12.05% interest, constant 12.39%) 9.29%
25% equity ® 10% 2.50%
11.79%
1987
75% mortgage (9.5% interest, constant 10.09%) 7.57%
25% equity @ 10% 2.50%
10.07%
The court cannot accept all of the expert’s postulated mortgage interest and equity dividend rates. I have undertaken an independent examination of the compendious data published by ACLI for all four quarters of each of the pretax years (1983 through 1986), with particular reference to the capitalization rates and loan values (mortgage positions) revealed by the ACLI data. To be sure, the capitalization rate column is not the product of sales; rather, the rates in the column reflect the relationship between net income and an appraiser’s estimate of fair market value of the property. Nevertheless, the capitalization rate data is highly probative inasmuch as the insurance companies included in the ACLI survey all make mortgage commitments on the basis of those appraised values.
I find that the aforementioned data, while not in the record, are widely disseminated, readily available, and frequently relied upon by professionals in the local property tax field. I therefore take judicial notice of the data pursuant to Evid.R. 9(2).
*396 Furthermore, this court may apply its own expertise in real property valuation; it is not obliged to accept the opinions of experts. Glen Wall Associates v. Wall Tp., 99 N.J. 265, 491 A.2d 1247 (1985).
Examination of the ACLI data disclosed the following averages for the years 1983 through 1986:
No. of Interest Loan
Year loans Cap, rate rate Constant position
1983 47 12.2 % 12.75% 13.17% 72%
1984 27 11.96% 13.5 % 13.7 % 70%
1985 77 11.8 % 12.18% 12.4 % 70%
1986 60 10.2 % 10.00% 11.15% 70%
On the basis of the foregoing data I conclude that the relevant capitalization rates, exclusive of the effective tax rate, are as follows with respect to each of the tax years under review:
1984
(10/1/83)
70% mortgage (12.75% interest, constant 13.31%) 9.32%
30% equity @ 10% * 3.00%
12.32%
1985
(10/1/84)
70% mortgage (13.5% interest, constant 13.75%) 9.60%
30% equity ® 8% * 2,40%
12.00%
1986
(10/1/85)
70% mortgage (12% interest, constant 12.34%) 8.64%
30% equity @11.2%* 3.36%
12.00%
*397 1987
(10/1/86)
70% mortgage (10% interest, constant 10.9%) 7.63%
30% equity @ 8.6% * 2.57%
10.20%
* As the overall capitalization rate reflected in the ACLI data includes an equity component, I have ascertained the equity component by simply subtracting the weighted mortgage position from the overall capitalization rate.
Defendant argues that mortgage interest rates should be stabilized for tax assessment purposes. The argument is facially appealing. It is indeed an established principle of law that property tax assessments should not be hostage to volatile fluctuations in the financial markets; and that the rate of return for tax purposes should reflect conditions for a reasonable span of years. New Brunswick v. N.J. Div. of Tax Appeals, supra, 39 N.J. at 550, 189 A.2d 702; Inwood at Great Notch v. Little Falls, 6 N.J. Tax 316 (Tax Ct.1984). Defendant’s argument, however, will be rejected for two reasons. First, the weighting factor in the band-of-investment calculations tends to smooth out the fluctuations in mortgage interest rates from one year to the next. Second, the application of c. 123 in non-revaluation years, with its safety corridor of 30%, eliminates all but the most extreme fluctuations. I conclude from an examination of the mortgage rates utilized by the expert that there are no severe fluctuations from one year to the next in this case so as to require a stabilizing adjustment.
The expert utilizes the unweighted, unclassified ratio in determining the effective tax rate component of the capitalization rate. The logical corollary to the use of such ratio in formulating the tax rate is that the same ratio would be applied to the court’s determination of the proper assessment irrespective of the 30% leeway mandated by c. 123 and in disregard of *398 the requirement that the taxable value of real property be fixed at 100% of true value in a revaluation year.
For the reasons expressed at some length in this court’s opinion in a companion case involving other property in Teaneck owned by Glenpointe Associates and including the same tax years as are in issue herein the court will not apply the unclassified, unweighted ratio in determining plaintiff’s entitlement to discrimination relief. The statutory remedy of c. 123 is controlling. Glen Pointe Associates v. Teaneck, 10 N.J.Tax 288, 306-308 (Tax Ct.1988) (slip opinion at 20-23).
Thus, the effective tax rate is determined by multiplying the actual tax rate by the Director’s ratio promulgated pursuant to c. 123 for each tax year. (That ratio is 100% for 1984, a revaluation year.). The effective tax rates are:
1984 (3.28% x 100%) 3.28%
1985 (3.45% x 90.48%) 3.12%
1986 (3.57% x 81.38%) 2.90%
1987 (3.81% x 67.33%) 2.56%
The total capitalization rates, inclusive of the effective tax rate, for the years in issue are as follows:
1984 14.60%
1985 15.12%
1986 14.9 %
1987 12.76%
The expert included in his appraisal the value of Block 4403, Lot 1, which this court has previously adjudicated in a separate opinion. The true value of that parcel will thus be subtracted from the capitalized value of the hotel. The expert also included 10% of the value of the parking garage in his valuation of the hotel. As the evidence shows that the hotel paid an annual rental for use of the garage by guests and visitors, no part of the garage will be included in the court’s finding of the hotel’s true value.
In view of the foregoing the court will apply the indicated capitalization rates to the economic net income as hereinabove found, and subtract the previously adjudicated true value of *399 Block 4403, Lot 1 for the years 1984 through 1987. The result is the hotel’s true value for each of the years in issue, to wit:
1984
$4,450,000 -b 14.60% = $30,479,400 (rounded)
Less value of Block 4403, Lot 1 244,600
True value $30,234,800
1985
$4,605,000 + 15.12% = $30,456,300 (rounded)
Less value of Block 4403, Lot 1 269,000
True value $30,187,300
1986
$4,694,000 h- 14.9% = $31,503,300 (rounded)
Less value of Block 4403, Lot 1 366,900
True value $31,136,400
1987
$4,876,000 -f- 12.76% = $38,996,800 (rounded)
Less value of Block 4403, Lot 1 428,000
True value $38,568,800

Discrimination.

Tax year 1984 was a revaluation year, to which c. 123 is inapplicable by its terms. N.J.S.A. 54:51A-6(d). The assessments of the hotel property (including the HVAC building) were:
Block 3720, Lot 5 $31,095,700 (96.81%)
Block 3720, Lot 6 855,600 (2.66%)
Block 3712, Lot 18 169,000 (0.53%)
Total $32,120,300 (100.0%)
As 1984 was a revaluation year and the court has rejected the use of the unweighted, unclassified ratio, judgment will be entered reducing the assessments of the hotel property to the true value of $30,234,800, allocable as follows:
*400 Block 3720, Lot 5 $29,270,300
Block 3720, Lot 6 804,200
Block 3712, Lot 18 160,000 [3]
$30,234,800
1985, 1986 and 1987.
As stated above with respect to the proper ratio to be employed in formulating the effective tax rate, the court rejects the use of the unweighted, unclassified ratio. Plaintiff has not shown that the application of c. 123 leaves it with confiscatory assessments, a showing mandated by Murnick v. Asbury Park, 95 N.J. 452, 471 A.2d 1196 (1984) and 525 Realty Holding Co. v. Hasbrouck Heights, 3 N.J.Tax 206 (1981). Chapter 123 will thus be applied to 1985, 1986 and 1987. As stated earlier, 1984 was a revaluation year to which c. 123 does not apply.
The application of c. 123 is automatic; it must be applied where the ratio of assessed to true value exceeds the upper limit or falls below the lower limit of the common level range, whether or not a counterclaim has been filed seeking an increase. Weyerhaeuser Co. v. Closter Boro., 190 N.J.Super. 528, 464 A.2d 1156 (App.Div.1983); Abe Schrader Corp. v. Secaucus, 8 N.J.Tax 390 (Tax Ct.1986). See FMC Stores Co. v. Morris Plains Boro., 100 N.J. 418, 428-430, 495 A.2d 1313 (1985) (court distinguishes a municipality’s claim for increased assessment in year to which c. 123 does not apply).
Thus, N.J.S.A. 54:51A-6 will be applied in this case for the years 1985, 1986 and 1987.
The average ratios and upper and lower limits of the common level range, all as determined by the Director, Division of Taxation pursuant to N.J.S.A. 54:l-35b, are as follows:
*401 Year Average ratio Upper limit Lower limit
1985 90.48% 100% 76.91%
1986 81.38% 93.59% 69.17%
1987 67.33% 77.43% 57.23%
The assessments for 1985, 1986 and 1987 were:
Block Lot 1985 1986 1987
3720 5 $35,301,700 $30,924,300 $30,924,300
3720 6 855,600 1,044,400 1,044,400
3712 18 169,000 206,300 206,300
$36,326,300 $32,175,000 $32,175,000
The ratio of assessments to true value for tax year 1985 exceeds 100%. Thus, N.J.S.A. 54:51A-6(b) requires that the assessments be revised by applying the average ratio (90.48%) to the court’s finding of true value ($30,187,300); and the assessments will consequently be fixed at $27,343,600, allocated as follows:
Block 3720, Lot 5 $26,471,300
Block 3720, Lot 6 727,300
Block 3712, Lot 18 145,000
$27,343,600
The ratio of assessments to true value for 1986 is 99.32%, which exceeds the upper limit of the common level range. Thus, the assessments will be revised by applying the average ratio (81.38%) to the court’s finding of true value ($31,136,400); and the assessments will consequently be fixed at $25,341,900, allocated as follows:
Block 3720, Lot 5 $24,533,500
Block 3720, Lot 6 674,100
Block 3712, Lot 18 134,300
$25,341,900
The ratio of assessments to true value for 1987 is 80.17%, which exceeds the upper limit of the common level range for that year. Thus, pursuant to N.J.S.A. 54:51A-6(a) the assessments will be revised by applying the average ratio (67.33%) to the court’s finding of true value ($38,568,800); and the assess- *402 merits will consequently be fixed at $25,968,300 allocated as follows:
Block 3720, Lot 5 $25,139,900
Block 3720, Lot 6 690,800
Block 3712, Lot 18 137,600
$25,968,300
The judgment for all years will reflect a further allocation between land and improvements in the same proportion as the original assessments for each year.

The court does not pass on the propriety of an adjustment regarding the income attributable to personal property. That is best left for another day.

The ACLI data was not included in his appraisal.

Although an allocation of the taxable value among all three of the lots involved is required, no judgment will be entered with respect to the 1984 assessment of Block 3712, Lot 18, as no appeal was filed for 1984 with respect to Block 3712, Lot 18.