NOT FOR PUBLICATION WITHOUT APPROVAL OF
THE TAX COURT COMMITTEE ON OPINIONS

## TAX COURT OF NEW JERSEY



**Patrick DeAlmeida**
**Presiding Judge**

R.J. Hughes Justice Complex
P.O. Box 975
25 Market Street
Trenton, New Jersey 08625-0975
(609) 292-8108 Fax: (609) 984-0805

April 21, 2017

Amber N. Heinz, Esq.
The Irwin Law Firm, P.A.
80 Main Street, Suite 410
West Orange, New Jersey 07052

Douglas M. Long, Esq.
Long, Marmero & Associates, LLP
44 Euclid Street
Woodbury, New Jersey 08096

> Re:  Free-Will, LLC c/o Stardust Motel
> v. City of Wildwood
> Docket No. 006799-2008
> Docket No. 009191-2009
> Docket No. 017714-2009

Dear Counsel:

This letter constitutes the court's opinion after trial in the above-referenced matters challenging the assessments on real property for tax years 2008 and 2009, as well as an added assessment prorated over seven months of tax year 2009. For the reasons stated more fully below, the assessments for tax years 2008 and 2009 are reduced and the added assessment prorated over seven months of tax year 2009 is vacated.

## I. Procedural History and Findings of Fact

The following findings of fact and conclusions of law are based on the evidence and testimony admitted at trial.

During the relevant tax years, plaintiff Free-Will, LLC was the owner of real property in the City of Wildwood, Cape May County. The parcel is designated in the records of the City as Block 148, Lot 16 and is commonly known as 3900 Ocean Avenue.

The subject property is approximately .36 acres in downtown Wildwood. The parcel, which is one block from public access to the boardwalk and the Atlantic Ocean beach, is located on the west side of Ocean Avenue with 80 feet of frontage on that roadway and on the south side of Spicer Avenue with 177 feet of frontage on that roadway. On the property sits the Stardust Motel, a two-story, circa 1960's structure with 23 hotel rooms and a manager's apartment. Each unit contains a living room with a kitchen, bedroom, and bath. Eight of the units are standard rooms, six are two-room units, and nine are one-room efficiencies. The hotel has an in-ground pool and on-site parking for 29 vehicles. Patrons access the second floor via exterior-mounted wooden stairs with a handrail. There is no elevator on the premises. Typical of the genre of establishments in the Wildwoods known informally as "Doo Wop" motels, the Stardust Motel has limited amenities and is occupied primarily during the summer months by guests enjoying the nearby boardwalk and beach. The motel has no restaurant, bar, shopping, or entertainment facilities, and is open from May to October. The property includes a detached, two-story, unheated cottage used to house motel staff.

The subject property is located in the City's hotel/motel zoning district. The principle permitted uses within the district are hotels, motels, resort facilities, restaurants, taverns, bars, specialty, novelty, and seashore-related retail, and residential dwelling units above ground floor.

In the mid-2000's, Wildwood zoning officials approved a master plan that incorporated in the subject property's zone a conditional use allowing for a limited high-rise hotel/condominium district centered around the Wildwood Convention Center and intended for year-round occupancy. This plan, if realized, would constitute a fundamental change in the nature of downtown Wildwood, which, at the time that the master plan was approved, was comprised primarily of low-rise motels offering relatively modest accommodations for short-term vacationers.

On April 3, 2006, the Wildwood Zoning Board of Adjustment issued a resolution conditionally approving the construction of a hotel/condominium project consisting of two integrated 23- and 24-story towers on twenty-two lots spanning two blocks of the City along Ocean and Atlantic Avenues. The subject property is one of three motels included in the planned development that is the subject of the resolution. The application for approval of the development was brought by Riviera Holding Company, LLC, the then contract purchaser of the twenty-two lots, including the subject property.

One proposed tower would include 67 hotel rooms, 138 residential dwelling units, 2,000 square feet of retail space, a pool, health club, and on-site parking. The other proposed tower would include 50 hotel rooms, 119 residential dwelling units, 2,640 square feet of retail space, a pool, health club, juice bar, spa, and on-site parking. The proposed 257 residential units would be either condominiums or townhouses, with the condominium units eligible to participate in a rental pool that would allow those units to be rented as additional hotel rooms. The proposed hotel rooms would be "first-class" units for customers attending events at the nearby convention center.

The proposed development of the subject property and twenty-one other lots did not take place. Plaintiff's 2006 federal from 1065, U.S. Return of Partnership Income, reports income of $300,000 from "cancelled sales contract – deposit penalty." That return was filed on February 13,

2007, prior to the first valuation date at issue here. Plaintiff's 20007 federal form 1065 reports income of $420,000 from "cancelled sales contract – deposit penalty." That return was filed on February 10, 2008, prior to the second valuation date at issue here.[1]

The failure of the proposed development of the subject property and other parcels is indicative of the fact that master plan's vision of high-density development of downtown Wildwood has not materialized. As of the relevant valuation dates, no high-rise hotel/ condominium development had taken place in Wildwood. It is not clear from the record whether the lack of high-rise development is the result of the economic forces that ultimately resulted in a serious downtown in the national economy, particularly in the real estate sector, in late 2008, or from other factors.

The municipality's expert testified that the Zoning Board of Adjustment's conditional approval was a single step in a multi-phase process of approvals necessary to construct the high-density development envisioned for the subject property and other parcels. There is no evidence in the record with respect to whether the developer sought necessary approvals from county, State, and environmental authorities with jurisdiction over the proposed development, including approvals necessary under the Coastal Area Facility Review Act, N.J.S.A. 13:19-1 to -21. Nor

---

[1] During trial, the court granted a motion to bar admission into evidence of the amount of consideration agreed upon in the contract or contracts for the purchase of the subject property that resulted in the forfeited deposits reported on plaintiff's federal tax returns. See Township of Little Egg Harbor v. Bonsangue, 316 N.J. Super. 271, 281 (App. Div. 1998). There are a number of reasons why the consideration in the contract or contracts is unreliable as evidence of value, including that title to the subject property was to be conveyed by the contract or contracts as part of an assemblage of properties and that the purchaser or purchasers sought to use the subject property for a purpose other than the highest and best use found most credible by the court. In addition, no witness offered testimony with respect to the arms-length nature of the transaction memorialized in the contract or contracts.

does the record contain any evidence with respect to whether it was reasonably probable that any such approvals would have been granted on the relevant valuation dates.

In addition, it was suggested at trial, although not proven in any detail, that from 2002 through 2005, the City of Wildwood, and adjoining municipalities, experienced a significant amount of redevelopment of older hotels and motels. A number of hotels and motels were razed to make way for the construction of low-rise condominiums for residential dwelling. Others were renovated for conversion to residential condominium units. According to defendant's expert, however, this type of redevelopment of older hotel and motel properties began to decline in 2006, with the number of new building permits in Wildwood City dropping from 300 in 2005 to just 19 in 2008. This represents an 89% decline in new permits when compared to 2004. The expert's report notes that as of the valuation dates at issue here a "large volume of unsold residential condominium units of both the flat and townhouse style" existed in Wildwood and neighboring municipalities, with an associated decline in property values and an extended period of time necessary to convey existing residential units.

A closer examination of the trial record reveals that there is no evidence that the residential redevelopment of older hotels and motels was taking place in the immediate vicinity of the subject property. Unlike adjoining municipalities and sections of Wildwood City with a more residential character, the neighborhood of the subject property is the central commercial area of the Wildwoods, adjacent to the convention center. No evidence was produced at trial that a demand existed in the marketplace for the construction of new or refurbished low-rise condominium residential units in the busy neighborhood of the subject property. To the contrary, the City's master plan quite plainly contemplates high-density, high-rise hotel/condominium development in the vicinity of the convention center, including at the site of the subject property. Although this

type of intense development of the area failed, nothing in the record suggests that a demand for less dense residential units existed in the vicinity of the subject property.

For tax years 2008 and 2009, the subject property was assessed as follows:

| | |
|---|---|
| Land | $1,530,000 |
| Improvement | $   391,600 |
| Total | $1,921,600 |

The Chapter 123 average ratio for the municipality for tax year 2008 is 89.30%. When the average ratio is applied to the assessment, the implied equalized value of the subject property for tax year 2008 is $2,151,847.

The Chapter 123 average ratio for the municipality for tax year 2009 is 90.74%. When the average ratio is applied to the assessment, the implied equalized value of the subject property for tax year 2009 is $2,117,699.

Plaintiff filed timely Complaints challenging the assessment on the property for both tax years. The municipality filed Counterclaims in response to the Complaints.

As a result of the tax year 2008 appeal, the municipal tax assessor visited the subject property. During his visit he observed what he described as "carpets being ripped up," "walls . . . being painted and sanded," and "upgrades" being done in the bathrooms. He conceded that the work he observed did not change the number of rental units at the subject and that he did not make a determination of whether the work would result in increased rental rates for the property owner. The assessor also conceded that he did not visit the subject property as the result of the issuance of building permits for the work he observed, although such permits may have been issued.

In light of his observations, the assessor determined that the condition of the subject property had improved from "fair" to "average." Using assessing software in his office, the assessor changed the "condition" code for the property from "fair" to "average." As a result of

6

this change, the software generated a new value for the subject that is higher than the prior assessment. The assessor subsequently imposed an added assessment of $177,500, prorated over seven months for tax year 2009. Plaintiff thereafter filed a timely Complaint challenging the tax year 2009 added assessment.

The tax year 2008, tax year 2009, and tax year 2009 added assessment appeals were consolidated for trial and this opinion.

During the two-day trial, each party presented an expert real estate appraiser to offer an opinion of the true market value of the subject property on the relevant valuation dates. The opinions of the expert witnesses diverged widely. The opinions are summarized as follows:

| Tax Year | 2008 | 2009 |
| --- | --- | --- |
| Valuation Date | 10/1/2007 | 10/1/2008 |
| | | |
| Plaintiff's Expert Appraiser | $  880,000 | $  850,000 |
| Defendant's Expert Appraiser | $2,200,000 | $1,955,000 |

The difference in opinions can be traced primarily to the experts' contrasting view of the effect, if any, of the potential development of the subject property for high-rise hotel/condominium use or its conversion to condominium dwelling units.

Plaintiff's expert opined that the highest and best use of the subject property both "as vacant" and "as improved" is its continued use as a motel. He acknowledged that for a number of years Wildwood and neighboring municipalities experienced an increase in the number of older hotels and motels purchased for demolition to make way for residential units or for refurbishment and conversion into condominium units. He opined, however, that by the relevant valuation dates the market for such uses of motel properties had stalled and was unlikely to return in a meaningful way. In addition, the expert opined that the use of the subject property as a component of a

largescale development of a high-rise hotel/condominium complex was highly speculative and unrealistic as of the valuation dates.

Plaintiff's expert, therefore, used only the income approach to reach an opinion of value. Under this approach, the expert reached opinions of value of $880,000 for tax year 2008 and $850,000 for tax year 2009.

The municipality's expert, on the other hand, opined that the highest and best use of the subject property "as vacant" is for future development of a two-tower, 23- and 24-story hotel/condominium project in accordance with the 2006 conditional approval of the Zoning Board of Adjustment. He further opined that the highest and best use of the subject property "as improved" would be for a continued, albeit interim, use as a motel while being held for future high-density development. He also opined that conversion of the subject to a 23-unit residential condominium "is also considered as an alternative 'improved' use . . . ."[2]

Using the income approach to determine the value of the subject property under his opined interim "as improved" highest and best use, the expert reached an opinion of value of $815,000 for tax year 2008 and $925,000 for tax year 2009. At trial, plaintiff's counsel stated on the record that, in the event that the court adopts the continued operation of a motel as the subject property's highest and best use, plaintiff would accept the opinions of value offered by the municipality's expert under the income capitalization approach.

---

[2] The report of defendant's expert refers to the subject property as Block 148, Lots 16, 17, 11.02, 12.01 and 12.02. As noted above, the Complaints and Counterclaims refer only to Block 148, Lot 16. A tax map included in the report of defendant's expert indicates that the Stardust Motel, and adjoining parking lot, occupy the five lots referenced in his report. The discrepancy between the pleadings and the report of defendant's expert was not raised at trial. The evidence suggests that the municipal tax assessor combined the assessments for all of the lots on which the Stardust Motel and parking lot sit into a single assessment on Block 148, Lot 16.

Using the cost approach, which would be consistent with the municipality's expert's interim "as improved" highest and best use opinion, he reached an opinion of value of $2,200,000 for tax year 2008 and $2,240,000 for tax year 2009.

Using the sales comparison approach, which reflects the expert's "as vacant" highest and best use opinion, he reached opinions of value of $2,200,000 for tax year 2008 and $1,955,000 for tax year 2009. These opinions are based primarily on the cost of land for the construction of new high-density development or residential condominium units.

Defendant's expert opined that generally the income capitalization approach would be given primary weight when forming an opinion of value for a motel with an as improved interim highest and best use of continuing as a motel. He offered the opinion, however, that the sales comparison evidence demonstrates that market participants in Wildwood and neighboring municipalities are acquiring hotels and motels similar to the subject at amounts significantly in excess of their income-capitalized value, likely because market participants foresee the reasonable probability of future redevelopment or conversion of older hotels/motels. He concluded, therefore, that despite the decline in the motel development/redevelopment market in Wildwood City, the sales comparison approach is most indicative of value for the subject property for the tax years in question. This conclusion, in effect, adopts the expert's "as vacant" highest and best use opinion.

In light of his decision to rely on the sales comparison approach, defendant's expert offered final opinions of value of $2,200,000 for tax year 2008 and $1,955,000 for tax year 2009.

Neither expert offered an opinion of value with respect to the added assessment prorated for seven months of tax year 2009.[3]

---

[3] After the conclusion of trial, plaintiff moved to stay issuance of a decision and to reopen the trial so that the court could consider a then-pending contract for the sale of the subject property.

II. Conclusions of Law

The court's value analysis begins with the well-established principle that "[o]riginal assessments . . . are entitled to a presumption of validity." MSGW Real Estate Fund, LLC v. Borough of Mountain Lakes, 18 N.J. Tax 364, 373 (Tax 1998). As Judge Kuskin explained, our Supreme Court has defined the parameters of the presumption as follows:

> The presumption attaches to the quantum of the tax assessment. Based on this presumption the appealing taxpayer has the burden of proving that the assessment is erroneous. The presumption in favor of the taxing authority can be rebutted only by cogent evidence, a proposition that has long been settled. The strength of the presumption is exemplified by the nature of the evidence that is required to overcome it. That evidence must be "definite, positive and certain in quality and quantity to overcome the presumption."
>
> [Ibid. (quoting Pantasote Co. v. City of Passaic, 100 N.J. 408, 413 (1985)(citations omitted)).]

The presumption of correctness arises from the view "that in tax matters it is to be presumed that governmental authority has been exercised correctly and in accordance with law." Pantasote, supra, 100 N.J. at 413 (citing Powder Mill, I Assocs. v. Township of Hamilton, 3 N.J. Tax 439 (Tax 1981)); see also Byram Twp. v. Western World, Inc., 111 N.J. 222 (1988). The presumption remains "in place even if the municipality utilized a flawed valuation methodology, so long as the quantum of the assessment is not so far removed from the true value of the property or the method of assessment itself is so patently defective as to justify removal of the presumption of validity."

---

Defendant opposed the motion. During oral argument on the motion, plaintiff's counsel informed the court that the sale was anticipated but had not been consummated. The court directed that it would withhold decision on the motion until the sale was consummated. Counsel was directed to inform the court once the sale of the subject had taken place. Having not received notice that the sale was consummated, the court concludes that the transaction did not take place. The motion, therefore, is moot.

Transcontinental Gas Pipe Line Corp. v. Township of Bernards, 111 N.J. 507, 517 (1988)(citation omitted).

"The presumption of correctness . . . stands, until sufficient competent evidence to the contrary is adduced." Little Egg Harbor Twp. v. Bonsangue, 316 N.J. Super. 271, 285-86 (App. Div. 1998)(citation omitted); Atlantic City v. Ace Gaming, LLC, 23 N.J. Tax 70, 98 (Tax 2006). "In the absence of a R. 4:37-2(b) motion . . . the presumption of validity remains in the case through the close of all proofs." MSGW Real Estate Fund, LLC, supra, 18 N.J. Tax at 377. In making the determination of whether the presumption has been overcome, the court should weigh and analyze the evidence "as if a motion for judgment at the close of all the evidence had been made pursuant to R. 4:40-1 (whether or not the defendant or plaintiff actually so moves), employing the evidentiary standard applicable to such a motion." Ibid. The court must accept as true the proofs of the party challenging the assessment and accord that party all legitimate favorable inferences from that evidence. Id. at 376 (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 535 (1995)). In order to overcome the presumption, the evidence "must be 'sufficient to determine the value of the property under appeal, thereby establishing the existence of a debatable question as to the correctness of the assessment.'" West Colonial Enter., LLC v. City of East Orange, 20 N.J. Tax 576, 579 (Tax 2003)(quoting Lenal Props., Inc. v. City of Jersey City, 18 N.J. Tax 405, 408 (Tax 1999), aff'd, 18 N.J. Tax 658 (App. Div.), certif. denied, 165 N.J. 488 (2000)), aff'd, 21 N.J. Tax 590 (App. Div. 2004).

Only after the presumption is overcome with sufficient evidence at the close of trial must the court "appraise the testimony, make a determination of true value and fix the assessment." Rodwood Gardens, Inc. v. City of Summit, 188 N.J. Super. 34, 38-39 (App. Div. 1982)(citations omitted). If the court determines that sufficient evidence to overcome the presumption that the

assessment is correct has not been produced, the assessment shall be affirmed and the court need not proceed to making an independent determination of value. Ford Motor Co. v. Township of Edison, 127 N.J. 290, 312 (1992); Global Terminal & Container Serv. v. City of Jersey City, 15 N.J. Tax 698, 703-04 (App. Div. 1996).

At the close of plaintiff's proofs, the court denied the municipality's motion to dismiss the Complaints for plaintiff's failure to overcome the presumption of correctness attached to the assessments. The court placed its findings of fact and conclusions of law on the record in the presence of counsel. Those findings and conclusions will not be repeated here at length. Put succinctly, the court concluded that the opinions of value offered by plaintiff's expert, which were based on an accepted methodology for determining value and on evidence of the type often used for such determinations, if accepted as true, raised doubt in the court's mind with respect to whether the assessments on the subject property exceeded true market for tax years 2008 and 2009. In addition, plaintiff raised sufficient doubts in the court's mind with respect to the validity of the added assessment prorated over seven months of 2009.

The court's inquiry, however, does not end here. Once the presumption is overcome, the "court must then turn to a consideration of the evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence." Ford Motor Co., supra, 127 N.J. at 312 (quotations omitted). "[A]lthough there may have been enough evidence to overcome the presumption of correctness at the close of plaintiff's case-in-chief, the burden of proof remain[s] on the taxpayer throughout the entire case . . . to demonstrate that the judgment under review was incorrect." Id. at 314-15 (citing Pantasote, supra, 100 N.J. at 413).

A.      Highest and Best Use.

An essential inquiry in this matter is the determination of the highest and best use of the subject property on the relevant valuation dates.  In Clemente v. Township of South Hackensack, 27 N.J. Tax 255, 267-269 (Tax 2013), aff'd, 28 N.J. Tax 337 (App. Div. 2015), Judge Andresini succinctly explained the legal precedents that guide this court in making a highest and best use determination:

> For property tax assessment purposes, property must be valued at its highest and best use.  Ford Motor Co. v. Township of Edison, 127 N.J. 290, 300-01, 604 A.2d 580 (1992).  "Any parcel of land should be examined for all possible uses and that use which will yield the highest return should be selected."  Inmar Associates, Inc. v. Township of Edison, 2 N.J. Tax 59, 64 (Tax 1980).  Accordingly, the first step in the valuation process is the determination of the highest and best use for the subject property.  American Cyanamid Co. v. Township of Wayne, 17 N.J. Tax 542, 550 (Tax 1998), aff'd, 19 N.J. Tax 46 (App. Div. 2000).  "The concept of highest and best use is not only fundamental to valuation but is a crucial determination of market value.  This is why it is the first and most important step in the valuation process."  Ford Motor Co. v. Township of Edison, 10 N.J. Tax 153, 161 (Tax 1988), aff'd o.b. per curiam, 12 N.J. Tax 244 (App. Div. 1990), aff'd, 127 N.J. 290, 604 A.2d 580 (1992); see also Gen. Motors Corp. v. City of Linden, 22 N.J. Tax 95, 107 (Tax 2005).
>
> The definition of highest and best use contained in The Appraisal of Real Estate, a text frequently used by this court as a source of basic appraisal principles, has remained relatively constant for all of the years under appeal.  Highest and best use is defined as:
>
>> The reasonably probable and legal use of vacant land or improved property that is physically possible, appropriately supported, and financially feasible and that results in the highest value.
>>
>> [Appraisal Institute, The Appraisal of Real Estate, 22 (13th ed. 2008).]
>
> The highest and best use analysis requires sequential consideration of the following four criteria, determining whether the use of the

13

subject property is: 1) legally permissible; 2) physically possible; 3) financially feasible; and 4) maximally productive. Ford Motor Co., supra, 10 N.J. Tax at 161; see also The Appraisal of Real Estate at 279. Implicit in this analysis is the assumption that the proposed use is market-driven; in other words, that it is determined in a value-in-exchange context and that there is a market for such use. WCI-Westinghouse v. Township of Edison, 7 N.J. Tax 610, 616-17 (Tax 1985), aff'd o.b. per curiam, 9 N.J. Tax 86 (App. Div. 1986). A highest and best use determination is not based on value-in-use because the determination is a function of property use and not a function of a particular owner's use of subjective judgment as to how a property should be used. See Entenmann's Inc. v. Borough of Totowa, 18 N.J. Tax 540, 545 (Tax 2000). The highest and best use of an improved property is the "use that maximizes an investment property's value, consistent with the rate of return and associated risk." Ford Motor Co., supra, 127 N.J. at 301, 604 A.2d 580. Further, the "actual use is a strong consideration" in the analysis. Ford Motor Co., supra, 10 N.J. Tax at 167.

Highest and best use is not determined through subjective analysis by the property owner. The Appraisal of Real Estate at 279. The proper highest and best use requires a comprehensive market analysis to ascertain the supply and demand characteristics of alternative uses. See Cherry Hill, Inc. v. Township of Cherry Hill, 7 N.J. Tax 120, 131 (Tax 1984), aff'd, 8 N.J. Tax 334 (App. Div. 1986). Additionally, the proposed use must not be remote, speculative, or conjectural. Id. If a party seeks to demonstrate that a property's highest and best use is other than its current use, it is incumbent upon that party to establish that proposition by a fair preponderance of the evidence. Penn's Grove Gardens, Ltd v. Borough of Penns Grove, 18 N.J. Tax 253, 263 (Tax 1999); Ford Motor Corp., supra, 10 N.J. Tax at 167. Property should be assessed in the condition in which it is utilized and the burden is on the person claiming otherwise to establish differently. Highview Estates v. Borough of Englewood Cliffs, 6 N.J. Tax 194, 200 (Tax 1983).

The highest and best use opinion offered by the taxpayer's expert is the use to which the property was put on the relevant valuation dates. It is, therefore, the burden of the municipality, whose expert offers a different highest and best use, to establish that the highest and best use of the subject property is for redevelopment to support a high-density, 25-story hotel/condominium project, or for conversion to residential condominium units.

Wildwood's expert did not undertake an extensive analysis of market data to reach his opinion with respect to the highest and best use of the subject property. While the highest and best use proposed by defendant's expert is legally permissible (provided the necessary regulatory approvals are obtained), the expert offered no objective market data supporting the conclusion that redevelopment or conversion of the subject property is financially feasible, physically possible, or maximally productive.

With respect to the construction of a high-density, hotel/condominium project on the subject property, the expert undertook no analysis of why the project proposed for the subject property by a contract purchaser in 2006 failed to come to fruition. Although the record contains a resolution of the Zoning Board of Adjustment conditionally approving the project, the expert conceded that a development of this type would require a number of additional approvals, including environmental permits. The expert did not investigate whether any additional approvals were sought for the proposed development or opine with respect to whether it would have been reasonably probable that those additional approvals would have been granted. There is, therefore, no evidence on which this court could determine that the grand proposal for redevelopment of the subject property as a hotel/condominium tower was feasible.

Nor did the expert examine the significance of the fact that the proposed high-density development of the subject property relied on the assemblage of twenty-one lots in addition to the subject property. Defendant's expert admitted that he did not know if a single 25-story hotel/condominium tower would fit on the subject property, let alone two such towers. Given that the Zoning Board of Adjustment's conditional approval concerned the redevelopment of three motels, the court concludes that the redevelopment of the subject for such a project would more likely than not require an assemblage of the subject with other properties. Thus, the court

15

concludes that in order to demonstrate that it was reasonably probable that the subject property would be redeveloped as a component of hotel/condominium tower project, it is necessary for the expert to establish that the assemblage of the necessary parcels for such a project is also a reasonable probability. The record does not contain evidence that would permit a conclusion that such an assemblage was a reasonable probability on the relevant valuation dates.[4]

Nor did the expert point to any data supporting the proposition that a market existed for high-rise hotel/condominiums in Wildwood City on the relevant valuation dates. It is clear from the record that the City's proposal to develop the downtown area in the vicinity of the convention center was not realized or imminent on the valuation dates. Nothing in the record suggests that the drastic change in the character of the Wildwood downtown was reasonably probable to occur on the valuation dates.

The expert's opinion that it is reasonably probable that the subject property would be converted to 23 condominium units is similarly flawed. The record contains no market data that there is a vital market for converted motel units in the downtown area of Wildwood. The expert, while noting an increase in the trend of older non-residential properties being razed for construction of new residential units "in a number of barrier island areas," also found that this trend "abated quite a bit inasmuch as the supply or inventory has exceeded the demand." He also noted that the subject property is "definitely lying in an area reflecting lessened growth and prospects attributable in part to the current downtown in the economy coupled with the oversupply in the residential condominium market."

---

[4]     The expert suggested at trial that plaintiff owned some of the twenty-one lots assembled with the subject property in the application before the Zoning Board of Adjustment. No evidence was admitted to establish this point.

Nor did the expert opine that the subject's immediate neighborhood experienced a significant number of motel conversions to residential units. To the contrary, the expert's report states that the "boardwalk, beach block, and the next block from the beach are primarily developed with a variety of commercial uses and motels." Additionally, the expert noted that the subject property is surrounded by six motels, a mall, and parking lots. This subject's immediate vicinity does not appear amenable to conversion to residential units, as it is a commercial area.[5]

The expert relied on several sales of land on which older structures were razed to make way for new residential development. These sales, however, were not in downtown Wildwood City. They were, instead, in the City of North Wildwood, which has a more residential character than does the area of the subject property. The two land sales identified by the expert in Wildwood City were purchased for high-density development of the type contemplated for the subject in 2006. Neither of those properties were developed, with the expert identifying one as a parking lot. As explained above, the court concludes that as of the relevant valuation dates, the high-density development of the subject for hotel/condominium use was highly speculative and unlikely.

The expert undertook no analysis of whether conversion of the subject to residential condominiums would be economically feasible. His report and testimony did not examine the costs that would be associated with converting the hotel rooms to condominium units. He did not compare such costs with what a purchaser might expect to obtain as consideration for the units to determine the economic viability of a conversion and whether this would result in the maximally productive return for the purchaser.

---

[5] The court notes that the zoning for the subject property permits residential units only above ground level. It appears that a variance would be needed to convert the ground-floor units at the subject property to residential condominiums.

The court finds the record lacks sufficient credible evidence upon which to adopt the opinion of the municipality's expert with respect to highest and best use. The court is not convinced that the high-density development of the subject as a hotel/condominium or the conversion of the motel into 23 residential condominium units was reasonably probable on the valuation dates. The municipality has not met its burden to establish a highest and best use contrary to the use to which the subject was put on the relevant valuation dates.

B.     Approach to Valuation.

"There are three traditional appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of income and cost." Brown v. Borough of Glen Rock, 19 N.J. Tax 366, 376 (App. Div.)(citing Appraisal Institute, The Appraisal of Real Estate 81 (11th ed. 2006)), certif. denied, 168 N.J. 291 (2001). "There is no single determinative approach to the valuation of real property." 125 Monitor Street, LLC v. City of Jersey City, 21 N.J. Tax 232, 237 (Tax 2004)(citing Samuel Hird & Sons, Inc. v. City of Garfield, 87 N.J. Super. 65, 72 (App. Div. 1965); ITT Continental Baking Co. v. Township of East Brunswick, 1 N.J. Tax 244 (Tax 1980)), aff'd, 23 N.J. Tax 9 (App. Div. 2005). "The choice of the predominant approach will depend upon the facts of each case and the reaction of the experts to those facts." Id. at 238 (citing City of New Brunswick v. Division of Tax Appeals, 39 N.J. 537 (1963); Pennwalt Corp. v. Township of Holmdel, 4 N.J. Tax 51, 61 (Tax 1982)).

The comparable sales approach "usually provides the primary indication of market value in appraisals of properties that are not usually purchased for their income-producing characteristics." Appraisal Institute, The Appraisal of Real Estate 419 (12th ed. 2001). This method of valuation has been defined as "[a] set of procedures in which a value indication is

18

derived by comparing the property being appraised to similar properties that have been sold recently, applying appropriate units of comparison, and making adjustments to the sales prices of the comparables based on the elements of comparison." Id. at 417.

The income capitalization approach is the preferred method of estimating the value of income producing property. Parkway Village Apartments Co. v. Township of Cranford, 108 N.J. 266, 270 (1987); Hull Junction Holding Corp. v. Borough of Princeton, 16 N.J. Tax 68, 79 (Tax 1996). "In the income capitalization approach, an appraiser analyzes a property's capacity to generate future benefits and capitalizes the income into an indication of present value." Appraisal Institute, The Appraisal of Real Estate 445 (13th ed. 2008). This approach generally applies to real property that generates income from the rental of the property, not from the business activities that take place at the property.

The cost approach is normally relied on to value special purpose property or unique structures for which there is no market. Borough of Little Ferry v. Vecchiotti, 7 N.J. Tax 389, 407 (Tax 1985); Dworman v. Borough of Tinton Falls, 1 N.J. Tax 445, 452 (Tax 1980), aff'd, 180 N.J. Super. 366 (App. Div.), certif. denied, 88 N.J. 495 (1981). The cost approach "involves a replication, through the use of widely accepted cost services . . . of the cost of the components of the building to be valued, less . . . depreciation[s]." Gale & Kitson Fredon Golf, LLC v. Township of Fredon, 26 N.J. Tax 268, 283 (Tax 2011)(quotations omitted). "A cost approach has two elements – land value and the reproduction or replacement cost of the buildings and other improvements." International Flavors & Fragrances, Inc. v. Borough of Union Beach, 21 N.J. Tax 403, 417 (Tax 2004). From the estimated reproduction cost is deducted depreciation from all causes. Depreciation is defined as a loss in value from three causes: physical depreciation, functional obsolescence and external economic factors. The cost approach is most effective when

the property being valued is new, in light of the difficulties in accurately estimating the various components of depreciation.  See Worden-Hoidal Funeral Homes v. Borough of Red Bank, 21 N.J. Tax 336, 338 (Tax 2004).

Given the court's finding with respect to highest and best use, the court concludes that the income capitalization approach is the best approach to determine the true market value of the subject property on the valuation dates.  The highest and best use of the subject property on the dates in question was as a motel.  The income approach is the most applicable approach for hotel/motel properties.  This is a widely accepted method for determining the value of real property used as a hotel.  See Glenpointe Assocs. v. Township of Teaneck, 10 N.J. Tax 380, 391 (Tax 1989), aff'd, 12 N.J. Tax 118 (App. Div. 1990); Prudential Ins. Co. v. Township of Parsippany-Troy Hills, 16 N.J. Tax 58, 60 (Tax 1995).

C.      Calculation of Value Using Income Capitalization Approach.

At trial, plaintiff informed the court that it was willing to accept the values offered by defendant's expert under the income capitalization approach.  The expert relied on both the actual income and expense records of the subject property, and data from the local motel market to reach his opinions of net operating income.  He stabilized his figures and capitalized the income stream using the widely accepted band of investment method to determine a mortgage constant, equity component, and loan to value ratio based on market data.  The court has reviewed the expert's report and testimony and accepts his opinions of value under the income capitalization approach: $815,000 for tax year 2008, and $925,000 for tax year 2009.

D.      Applying Chapter 123.

Pursuant to N.J.S.A. 54:51A-6a, commonly known as Chapter 123, in a non-revaluation year an assessment must be reduced when the ratio of the assessed value of the property to its true

value exceeds the upper limit of the common level range. The common level range is defined by N.J.S.A. 54:1-35a(b) as "that range which is plus or minus 15% of the average ratio" for the municipality in which the subject property is located.

The true values determined above must, therefore, be compared to the common level range for Wildwood City for the relevant tax years. The formula for determining the subject property's ratio is:

$$\text{Assessment} \div \text{True Value} = \text{Ratio}$$

1. Tax Year 2008

$$\$1{,}921{,}600 \div \$815{,}000 = 2.36$$

The chapter 123 average ratio for Wildwood City for tax year 2008 is 89.30 with an upper limit of 1.027 and a lower limit of .7591. The ratio for the subject property for this tax year is 2.36, which exceeds the upper limit of the range for this tax year. Consequently, the court will determine the assessment for the subject property for tax year 2008 by multiplying the true value by the Chapter 123 ratio:

$$\$815{,}000 \quad x \quad .8930 = \$727{,}795$$

The court will enter a Judgment establishing the assessment for the subject property for tax year 2008 follows:

| Land | $379,800 |
|---|---|
| Improvement | $348,000 |
| Total | $727,800 |

2. Tax Year 2009

$$\$1{,}921{,}600 \div \$925{,}000 = 2.08$$

The chapter 123 average ratio for Wildwood City for tax year 2009 is 90.74 with an upper limit of 1.043 and a lower limit of .7713. The ratio for the subject property for this tax year is

21

2.08, which exceeds the upper limit of the range for this tax year. Consequently, the court will determine the assessment for the subject property for tax year 2009 by multiplying the true value by the Chapter 123 ratio:

$$\$925,000 \quad x \quad .9074 \quad = \quad \$839,345$$

The court will enter a Judgment establishing the assessment for the subject property for tax year 2009 follows:

| | |
|---|---|
| Land | $491,500 |
| Improvement | $348,000 |
| Total | $839,500 |

E.     The Tax Year 2009 Added Assessment.

An added assessment is intended to capture any increase in value that occurs as a consequence of the completion of the erection, addition to or improvement of any building or structure after the October 1 valuation date for a particular tax year. American Hydro Power Partners, LP v. City of Clifton, 239 N.J. Super. 130, 138 (App. Div. 1989).

There are two added assessment statutes. The first, N.J.S.A. 54:4-63.2, provides for the making of an added assessment when a structure has been erected, added to or improved after the October 1 valuation date and before the January 1 start of the tax year. In such a case, the assessor makes an added assessment for the entire subsequent tax year, and also an added assessment for a pro-rated portion of the tax year of completion from the first day of the month following completion through December 31.

The second added assessment statute, N.J.S.A. 54:4-63.3, allows for an added assessment where a structure has been erected, added to or improved after the October 1 valuation date for a particular tax year and between the following January 1 and October 1 of the tax year. N.J.S.A. 54:4-63.3 provides that the assessor, after examination and inquiry, is to determine the taxable

value of the improvements as of the first of the month following completion. If the value exceeds the assessment made as of the preceding October 1, the assessor makes the added assessment by multiplying the excess value by the number of whole months remaining in the tax year after completion of the improvements and dividing the result by 12. N.J.S.A. 54:4-63.3. The purpose of this statute "is to permit the taxation of real property which becomes taxable during the year following the assessment date of October 1 in order to avoid having properties escape taxation until the next assessment date arrives." Snyder v. Borough of South Plainfield, 1 N.J. Tax 3, 7 (Tax 1980).

This court has held that the mere retrofitting, upgrading or remediation of deferred maintenance of a hotel does not constitute an improvement to a building or structure permitting an added assessment. Fifth Roc Jersey Associates, LLC v. Town of Morristown, 26 N.J. Tax 212 (Tax 2011)(citing Harrison Realty Corp. v. Town of Harrison, 16 N.J. Tax 375 (Tax), aff'd, 17 N.J. Tax 174 (App. Div. 1997), certif. denied, 153 N.J. 113 (1998)).

The evidence adduced at trial supports the conclusion that the renovation work observed by the assessor during his visit to the subject property does not support imposition of an added assessment. The assessor observed carpets being replaced, walls being sanded and repaired, and bathrooms being upgraded. The replacement of carpets and minor repairs to walls quite plainly do not constitute improvements warranting an added assessment. While an "upgrade" to a bathroom might be of sufficient dimension to support an added assessment, the record contains no evidence detailing how the bathrooms at the subject property were improved. Nothing offered by the assessor suggests that bathtubs, toilets and sinks were replaced, that plumbing was improved, or other major renovations were implemented in the bathrooms. In addition, the assessor's testimony indicated that he calculated the added assessment not by determining the value of new

improvements but by changing the "condition" data field for the subject property in a software program from "fair" to "average." This suggests that the changes to the bathrooms were cosmetic in nature.

The court is satisfied that plaintiff met it burden of establishing by a preponderance of the evidence that the added assessment prorated for seven months of 2009 was invalid. <u>Otelsberg v. Township of Bloomfield</u>, 18 <u>N.J. Tax</u> 243, 248 (Tax 1999). The court will enter Judgment vacating the tax year 2009 added assessment.

Very truly yours,

/s/Hon. Patrick DeAlmeida, P.J.T.C.
