**NOT FOR PUBLICATION WITHOUT THE APPROVAL
OF THE TAX COURT COMMITTEE ON OPINIONS**

```
---------------------------------------------------x
MONTCLAIR TOWN CENTER LLC,          :      TAX COURT OF NEW JERSEY
                                    :      DOCKET NOS.:      002848-2014
            Plaintiff,              :                        004656-2015
                                    :
v.                                  :             Civil Action
                                    :
MONTCLAIR TOWNSHIP,                 :
                                    :
            Defendant.              :
---------------------------------------------------x
```

Decided:  March 24, 2021

Michael I. Schneck for plaintiff (Schneck Law Group, LLC, attorneys).

Joseph V. Sordillo for defendant (DiFrancesco, Bateman, Kunzman, Davis, Lehrer & Flaum, P.C., attorneys).

NOVIN, J.T.C.

This shall constitute the court's opinion following trial of local property tax appeals filed by plaintiff, Montclair Town Center, LLC ("MTC").  MTC challenges the 2014 and 2015 local property tax assessments on its improved property located in Montclair Township ("Montclair Township").

For the reasons stated more fully below, the court affirms the 2014 and 2015 tax year local property tax assessments.

## I.    **Findings of Fact**

Pursuant to R. 1:7-4, the court makes the following findings of fact and conclusions of law based on the evidence and testimony adduced during trial.

MTC is the owner of the real property and improvements located 37 North Mountain Avenue, Montclair Township, Essex County, New Jersey (the "subject property").  The subject

property is identified as Block 1507, Lot 20 on Montclair Township's municipal tax map.[1] The subject property is located on the corner of North Mountain Avenue and Claremont Avenue. As of the October 1, 2013 and October 1, 2014 valuation dates, the site comprised a 1.244-acre, rectangular shaped parcel with frontage along North Mountain Avenue and Claremont Avenue.

MTC filed direct appeals with the Tax Court challenging the subject property's 2014 and 2015 tax year local property tax assessments.[2] Montclair Township did not file counterclaims.[3]

As of the October 1, 2013 and October 1, 2014 valuation dates, the subject property was improved with a two and a half story, 17,129 square foot, thirteen room hotel, known as The Georgian Inn,[4] a two-story "Carriage House," and an asphalt parking area.[5] The Carriage House consisted of approximately 2,650 square feet of first-floor office space, and a second-floor residential apartment consisting of approximately 868 square feet. On or about March 9, 2014, the Carriage House sustained a fire rendering it damaged and unable to be occupied.[6]

---

[1] During trial, testimony was elicited that on or about October 15, 2014 subdivision approval was obtained from Montclair Township for the subject property, resulting in the creation of two separate tax lots: (i) Block 1507, Lot 20; and (ii) Block 1507, Lot 19.

[2] MTC also filed appeals challenging the subject property's 2014, 2015, 2016, 2017, and 2019 local property tax assessments under docket numbers 002848-2014, 004656-2015, 001896-2016, 002590-2017, and 007006-2019. MTC instituted local property tax appeals challenging the 2016 and 2017 tax year assessments on Block 1507, Lot 19 under docket numbers 011374-2016 and 008337-2017. On November 9, 2020, MTC filed complaint withdrawals for docket numbers 011374-2016 and 008337-2017. On December 10, 2020, the court entered an order dismissing docket number 007006-2019. On January 13, 2021, MTC filed complaint withdrawals for docket numbers 001896-2016 and 002590-2017.

[3] Montclair Township filed a counterclaim with respect to Block 1507, Lot 20, for the 2019 tax year under docket number 007006-2019. On January 13, 2021, Montclair Township filed a counterclaim withdrawal.

[4] Pursuant to MTC's Answers to Interrogatories dated May 14, 2015.

[5] In or about July 2015, following the valuation dates at issue, The Georgian Inn underwent extensive renovations and was converted into a thirty-four-unit hotel.

[6] According to MTC's expert (as such term is defined herein), his August 12, 2020 appraisal report contains no reference to the 2014 Carriage House fire because he was unaware of it when he prepared the appraisal report.

The subject property is situated in Montclair Township's R3 – Garden Group Zone, permitting apartment complexes, and conditionally permitting rooming houses and boarding homes.[7] However, hotels and offices are not permitted uses in the R3 – Garden Group Zone. The use of the property as a hotel and the Carriage House as an office preceded adoption of the current zoning ordinance and, therefore, is a pre-existing, legally permitted, non-conforming use. The subject property is situated in the X Flood Hazard Zone, denoting an area of minimal flooding risk.

MTC acquired the subject property on September 17, 2012, for reported consideration of $1,561,000.

During trial, MTC offered testimony from a State of New Jersey certified general real estate appraiser, who was accepted by the court, without objection, as an expert in the field of property valuation (the "expert"). MTC's expert prepared an appraisal report dated August 12, 2020, expressing an opinion of the subject property's true or fair market value as of the October 1, 2013, and October 1, 2014 valuation dates.

As of each valuation date, the subject property's local property tax assessment, implied equalized value, and MTC's expert's value conclusions are set forth below:

| Valuation dates | Tax Assessment | Average ratio of assessed to true value | Implied equalized Value | MTC's expert's concluded value |
|---|---|---|---|---|
| 10/1/2013 | $2,090,400 | 88.26% | $2,368,457 | $1,100,000 |
| 10/1/2014 | $2,090,400 | 85.58%[8] | $2,442,627 | $1,100,000 |

---

[7] MTC's expert's appraisal report erroneously identified the subject property as being situated in Montclair Township's R3 – Medium Density Residential District. MTC's expert acknowledged this error during both direct and cross-examination, explaining that the subject property is situated in the R3 - Garden Group Zone.

[8] According to the New Jersey Division of Taxation's Table of Equalized Valuations, the Director's ratio for Montclair Township for the 2014 tax year was 85.28%.

## II. Procedural History

On September 13, 2019, the court entered a Case Management Order directing MTC and Montclair Township to mutually exchange trial-ready appraisal reports by January 6, 2020.[9] Thereafter, on January 3, 2020, MTC requested an adjournment of the mutual appraisal exchange date and trial date.

On January 28, 2020, the court entered a Second Case Management Order directing MTC and Montclair Township to mutually exchange trial-ready appraisal reports by March 20, 2020 and assigned a peremptory trial date for April 20, 2020. On March 12, 2020, MTC requested an additional adjournment of the mutual appraisal exchange date and the peremptory trial date.

On March 12, 2020, the court entered a Third Case Management Order directing MTC and Montclair Township to mutually exchange trial-ready appraisal reports by June 26, 2020 and assigned a new peremptory trial date for July 29, 2020. On June 24, 2020, MTC again requested an additional adjournment of the mutual appraisal exchange date and peremptory trial date. On June 26, 2020, the court adjourned the mutual appraisal exchange date to August 24, 2020 and the peremptory trial date to October 22, 2020. On August 24, 2020, MTC requested an additional one-week adjournment of the mutual appraisal exchange date. On August 25, 2020, the court adjourned the mutual appraisal exchange date to August 31, 2020. On August 31, 2020, MTC and Montclair Township mutually exchanged the trial-ready appraisal reports to be relied upon at trial in the above matters.

---

[9] For docket numbers 002848-2014, 004656-2015, 001896-2016, 011374-2016, 002590-2017, 008337-2017, and 007006-2019. Contemporaneous therewith, the court entered a Case Management Order for docket numbers 011374-2016 and 008337-2017, with respect to Block 1507, Lot 19.

However, MTC's expert produced an appraisal report that contained several material errors and deficiencies. First, the report contained no analysis of the subject property's highest and best use as of the valuation dates and misidentified the subject property's zoning district. Moreover, the appraisal report excluded any value opinion for the subject property for the 2019 tax year.[10] Finally, the appraisal report omitted any value opinion for Block 1507, Lot 19, for docket numbers 011374-2016 and 008337-2017. Accordingly, on October 15, 2020, Montclair Township moved before the court, under R. 4:25-8, for dismissal of these matters and to bar admission of MTC's expert's appraisal report, as containing inadmissible net opinions. Montclair Township also sought to bar MTC from offering any valuation testimony with respect to: (i) the subject property for the 2019 tax year; and (ii) Block 1507, Lot 19, for the 2016 and 2017 tax years.

On October 20, 2020, the court conducted a pre-trial telephone conference call with MTC's counsel and Montclair Township's counsel with respect to the October 22, 2020 peremptory trial and pending motions. During the telephone conference MTC's counsel, with the consent of Montclair Township's counsel, requested a brief adjournment of the peremptory trial so that the parties could continue to engage in settlement discussions. Accordingly, the court briefly adjourned the peremptory trial date to permit the parties to continue their settlement discussions and calendared Montclair Township's motions for disposition on November 13, 2020.[11] On November 9, 2020, MTC's counsel filed a response to Montclair Township's motion and a cross-

---

[10] Additionally, as of the October 1, 2014, valuation date, the appraisal report misstated the subject property's gross revenues and attributed rent to the Carriage House office, despite it having been rendered uninhabitable by fire, resulting in miscalculations and corrections to effective gross income, and potential gross income.

[11] The return date of Montclair Township's motion and MTC's cross-motion was subsequently adjourned to December 4, 2020, to enable Montclair Township to respond to MTC's cross-motion. In addition, the peremptory trial date was rescheduled for January 19, 2021.

5

motion seeking leave to submit an amended trial appraisal report and to bar testimony from Montclair Township's municipal tax assessor.

On December 10, 2020, the court entered an order: (i) dismissing MTC's 2019 complaint; (ii) denying Montclair Township's motion to bar admission of MTC's expert's appraisal report; (iii) denying MTC's motion to submit an amended trial appraisal report; and (iv) limiting the testimony, if any, from Montclair Township's municipal tax assessor to factual matters. The court found that based on the motion record, insufficient information existed to support a finding that MTC's expert's August 12, 2020 appraisal report contained inadmissible net opinions. The court emphasized that no deposition of MTC's expert had been conducted and no testimony elicited from the expert from which the court could discern whether the expert's appraisal report possessed some logical basis, steeped in fact, to support his conclusions.

## III. Conclusions of Law

### A. Presumption of Validity and Highest and Best Use

"Original assessments and judgments of county boards of taxation are entitled to a presumption of validity." MSGW Real Estate Fund, LLC v. Mountain Lakes Bor., 18 N.J. Tax 364, 373 (Tax 1998). "Based on this presumption, the appealing taxpayer has the burden of proving that the assessment is erroneous." Pantasote Co. v. Passaic City, 100 N.J. 408, 413 (1985) (citing Riverview Gardens v. North Arlington Bor., 9 N.J. 167, 174 (1952)). "The presumption of correctness . . . stands, until sufficient competent evidence to the contrary is adduced." Little Egg Harbor Twp. v. Bonsangue, 316 N.J. Super. 271, 285-86 (App. Div. 1998). A taxpayer can only rebut the presumption by introducing "cogent evidence" of true value. That is, evidence "definite, positive and certain in quality and quantity to overcome the presumption." Aetna Life Ins. Co. v. Newark City, 10 N.J. 99, 105 (1952). Thus, at the close of a plaintiff's proofs, the court must be

6

presented with evidence that raises a "debatable question as to the validity of the assessment." MSGW Real Estate Fund, LLC, 18 N.J. Tax at 376.

When evaluating whether the evidence presented satisfies the "cogent evidence" standard, the court "must accept such evidence as true and accord the plaintiff all legitimate inferences which can be deduced from the evidence." Id. at 376 (citing Brill v. Guardian Life Insurance Co. of Am., 142 N.J. 520 (1995)). The evidence presented, when viewed under the Brill standard "must be 'sufficient to determine the value of the property under appeal, thereby establishing the existence of a debatable question as to the correctness of the assessment.'" West Colonial Enters, LLC v. City of East Orange, 20 N.J. Tax 576, 579 (Tax 2003) (quoting Lenal Properties, Inc. v. City of Jersey City, 18 N.J. Tax 405, 408 (Tax 1999), aff'd, 18 N.J. Tax 658 (App. Div. 2000), certif. denied, 165 N.J. 488 (2000)). "Only after the presumption is overcome with sufficient evidence . . . must the court 'appraise the testimony, make a determination of true value and fix the assessment.'" Greenblatt v. Englewood City, 26 N.J. Tax 41, 52 (Tax 2011) (quoting Rodwood Gardens, Inc. v. Summit City, 188 N.J. Super. 34, 38-39 (App. Div. 1982)).

At the close of MTC's proofs, Montclair Township moved for dismissal of these matters under R. 4:37-2(b), arguing that MTC's expert's conclusions amounted to inadmissible net opinions because: (i) the appraisal report omitted an analysis of the subject property's highest and best use; (ii) the adjustments applied under the sales comparison and income capitalization approaches to value were unsupported by market derived data; and (iii) the vacancy and collection loss factors and stabilized expenses applied under the income capitalization approach amounted to subjective reflections, unsupported by market derived data. In sum, Montclair Township maintained that MTC failed to overcome the presumption of validity that attaches to the subject property's local property tax assessments.

7

Indispensable to the property valuation process is determination of a property's highest and best use. Ford Motor Co. v. Edison Twp., 10 N.J. Tax 153, 161 (Tax 1988), aff'd o.b., 12 N.J. Tax 244 (App. Div. 1990), aff'd, 127 N.J. 290 (1992). See also General Motors Corp. v. Linden City, 22 N.J. Tax 95, 107 (Tax 2005). "For local property tax assessment purposes, property must be valued at its highest and best use." Entenmann's Inc. v. Totowa Bor., 18 N.J. Tax 540, 545 (Tax 2000).

The phrase highest and best use is defined as:

> The reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, financially feasible, and that results in the highest value . . . Alternatively, the probable use of land or improved property – specific with respect to the user and timing of the use – that is adequately supported and results in the highest present value.
>
> [Appraisal Institute, The Dictionary of Real Estate Appraisal (5th ed. 2010).]

Thus, the highest and best use analysis has been characterized as the "sequential consideration of the following four criteria, determining whether the use of the subject property is: 1) legally permissible; 2) physically possible; 3) financially feasible; and 4) maximally productive." Clemente v. South Hackensack Twp., 27 N.J. Tax 255, 267-269 (Tax 2013), aff'd, 28 N.J. Tax 337 (App. Div. 2015). See also County of Monmouth v. Hilton, 334 N.J. Super. 582, 588 (App. Div. 2000).

However, the highest and best use of a property is not a static principle. The highest and best use of a property may alter over time with a market that is in transition, or resulting from changes in the economic climate, zoning, or from the presence or lack of development. Thus, when performing a highest and best use analysis the appraiser must engage in an interpretation of

8

"the market forces that affect the subject property and identify[] the use or uses on which the final opinion of value is based." Appraisal Institute, The Appraisal of Real Estate, 42 (14th ed. 2013). Importantly, the highest and best use of a property is not viewed through a subjective spectrum, "rather, highest and best use is shaped by the competitive forces within the market where the property is located . . . the [market] analysis and interpretation of highest and best use is an economic study of market forces focused on the subject property." Entenmann's Inc., 18 N.J. Tax at 545; see also Clemente, 27 N.J. Tax at 267-269. Thus, an appraiser's scrutiny and analysis of the marketplace and recitation of the appraiser's findings is pivotal to the process because it offers an understanding of the market conditions that exist, which can be measured against any proposed development. It also offers meaningful insight into matters of supply and demand and how property values may change over a period of time. Embedded in that analysis is the concept of value in exchange, i.e. the selected use "must be a probable use for which there must be a demand in the relevant market." WCI-Westinghouse, Inc. v. Edison Twp., 7 N.J. Tax 610, 616 (Tax 1985), aff'd, 9 N.J. Tax 86 (App. Div. 1986).

An appraiser's highest and best use analysis must not be grounded upon the value in use of a property, i.e. the value a property may have for its specifically designed purposes, because that use may not reflect true market value. A property "should be examined for all possible uses and that use which will yield the highest return should be selected." General Motors Corp., 22 N.J. Tax at 125 (quoting Owens-Illinois Glass Co. v. Bridgeton, 8 N.J. Tax 495 (Tax 1986)).

Here, conspicuously absent from MTC's expert's appraisal report was any discussion or analysis of the marketplace, nor evidence that the four highest and best use criteria were considered. Rather, MTC's expert's appraisal report recited only that the subject property's highest and best use, as vacant, is for "Commercial Development," and as improved, is for

9

"Existing Use, Mixed-Use Facility." MTC's expert's appraisal report further expressed that "[o]verall, there are no known factors which are considered to prevent the site from development to its highest and best use, as if vacant, or adverse to the existing use of the site." In sum, MTC's expert's appraisal report offered no meaningful insight into the subject property's market, the competitive forces at play within that market, application of the four highest and best criteria, and how MTC's expert's scrutiny and analysis of those considerations affected his conclusions of the subject property's highest and best use.[12]

Nonetheless, during trial, MTC's expert offered testimony that although omitted from the appraisal report, he did perform a highest and best use analysis, applying the four required criteria. In conducting his highest and best use analysis, as vacant, MTC's expert submitted that "I look at all uses that are allowed in that zone." Finding that Montclair Township's zoning ordinance permitted construction of apartment units and that the site contains 1.244-acres, he concluded that an "apartment facility" was physically possible. Based on his further review of the zoning ordinance, he determined that eighteen apartment units are permitted, per acre. Thus, MTC's expert concluded that twenty-two apartment units could be constructed on the subject property. MTC's expert then reviewed sales of all properties having a legally permitted use in the zoning district, concluding that "apartments had the highest value that can be attributable to the land." Accordingly, in MTC's expert's opinion, an "apartment facility," which he equated to the "Commercial Development" identified in his appraisal report, was the highest and best use of the subject property, as vacant.

---

[12] In denying Montclair Township's in limine motion, under R. 4:25-8, seeking to bar the appraisal report as an inadmissible net opinion, the court declined to dismiss MTC's complaint, electing to afford MTC's expert the opportunity to offer testimony at trial explaining these alleged omissions.

In conducting his highest and best use, as improved, analysis MTC's expert offered that he first evaluated whether the subject property's existing improvements should be "altered, or torn down, to change the improved use." He then evaluated the subject property's current uses and the value conclusions that he reached against the highest and best use "test," that he characterized as "it's got to be legally permissible, then it has to be physically possible, then it has to be financially feasible and lastly, maximally productive." Accordingly, in MTC's expert's opinion "continuing the existing use" of the subject property was its highest and best use, as improved.

Despite MTC's expert's appraisal report having omitted any analysis of the four highest and best use criteria, the court declined to grant Montclair Township's motion to dismiss MTC's complaints. Although the recitation offered during trial by MTC's expert of the highest and best use analysis employed was imperfect, the court found credible MTC's expert's testimony that he did conduct a highest and best use analysis, and considered each of the four highest and best use criteria in reaching his conclusions.[13] Therefore, according MTC all reasonable and legitimate inferences which could be deduced from the evidence presented, the court concluded that MTC produced cogent evidence sufficient to overcome the presumption of validity. If accepted as true, the opinions of MTC's expert and the facts and analysis upon which he relied raised debatable questions regarding the correctness of the subject property's local property tax assessments for the 2014 and 2015 years. See MSGW Real Estate Fund, LLC, 18 N.J. Tax at 376. Accordingly, the court denied Montclair Township's motion and placed a statement of reasons on the record.

However, concluding that the presumption of validity has been overcome does not equate

---

[13] MTC's expert failed to offer any details regarding his analysis of the market forces in the subject property's area, and how those forces impacted or shaped the highest and best or use or other potentially highest and best uses of the subject property – failed to provide any explanation of the other possible uses he apparently considered and how an "apartment facility" yields the highest return.

to a finding by the court that the subject property's 2014 and 2015 tax assessments are erroneous. Once the presumption has been overcome, "the court must then turn to a consideration of the evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence." Ford Motor Co., 127 N.J. at 312. The court must be mindful that "although there may have been enough evidence [presented] to overcome the presumption of correctness at the close of plaintiff's case-in-chief, the burden of proof remain[s] on the taxpayer . . . to demonstrate that the judgment [or local property tax assessment] under review was incorrect." Id. at 314-15 (citing Pantasote Co., 100 N.J. at 413).

B.    Approaches to Value

"There is no single determinative approach to the valuation of real property." 125 Monitor Street LLC v. City of Jersey City, 21 N.J. Tax 232, 237-38 (Tax 2004) (citing Samuel Hird & Sons, Inc. v. Garfield City, 87 N.J. Super. 65, 72 (App. Div. 1965)); ITT Continental Baking Co. v. East Brunswick Twp., 1 N.J. Tax 244, 251 (Tax 1980). "There are three traditional appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of income and cost." Brown v. Glen Rock Bor., 19 N.J. Tax 366, 376 (App. Div. 2001), certif. denied, 168 N.J. 291 (2001) (internal citation omitted)). The "decision as to which valuation approach should predominate depends upon the facts of the particular case and the reaction to these facts by the experts." Coca-Cola Bottling Co. of New York v. Neptune Twp., 8 N.J. Tax 169, 176 (Tax 1986) (citing New Brunswick v. Tax Appeals Div., 39 N.J. 537 (1963)).

During trial, MTC's expert expressed his opinion that the subject property was being operated like an apartment complex, and due to its condition, which he described as "poor" and "decrepit," resulted a difficult appraisal project. Ultimately, after examining all three approaches

12

to value, MTC's expert concluded that the sales comparison and income capitalization approaches should be employed to estimate the subject property's true or fair market value.

1.    Sales Comparison Approach

The sales comparison approach is predicated upon an evaluation of market transactions involving the recent sale of similar properties. This approach involves a "comparative analysis of properties" and requires the appraiser to focus on the "similarities and differences that affect value . . . which may include variations in property rights, financing, terms, market conditions and physical characteristics." The Appraisal of Real Estate at 378. "When data is available, this [approach] is the most straightforward and simple way to explain and support an opinion of market value." Greenblatt, 26 N.J. Tax at 53. The framework underlying the sales comparison approach is that "an opinion of the market value of a property can be supported by studying the market's reaction to comparable and competitive properties." The Appraisal of Real Estate at 377. Thus, the efficacy and suitability of the sales comparison approach is dependent upon the sufficiency of the data on recent market transactions, the appraiser's diligent investigation of the data, and the appraiser's detailed analysis of that data.

In conducting his sales comparison approach, MTC's expert searched CoStar listings of reported sales in the northern New Jersey area for "hotel, rooming house, SRO - single room occupancy type of facilities, under twenty units." MTC's expert identified five properties that sold between February 2011 and July 2014, that he opined were comparable to the subject property. The properties consisted of between 6 and 19 units and ranged in size from 2,650 to 7,994 square feet. The properties possessed lot sizes from 0.17-acres to 10.24-acres. Three properties were located in Bergen County (Hackensack and Ridgewood), one property was located in Union

County (Summit), and one property was located in Sussex County (Newton). The unadjusted sale prices of the five properties ranged from $43,421 to $71,870 per unit.

### a. Reliable indicator of fair market value

MTC's expert's sales comparison approach suffers from material flaws fatal to its credibility. MTC's expert relies on comparable sales 2, 3, and 5 in deriving a per unit value that he applies to the subject property's thirteen units. However, trial testimony revealed that MTC's expert failed to verify the terms of comparable sales 2, 3, and 5 with any participant involved in those transactions.

Our Legislature has directed that, in Tax Court proceedings, "any person being offered as a witness with respect to the review of a local property tax assessment shall possess information or knowledge regarding comparable properties acquired from owners, sellers, purchasers, lessees, brokers or attorneys who were a party to, or participated in, the transaction." VBV Realty, LLC v. Scotch Plains Twp., 29 N.J. Tax 548, 562 (Tax 2017) (citing N.J.S.A. 2A:83-1). Specifically, N.J.S.A. 2A:83-1 requires that:

> in any action or proceeding in the Tax Court, any person offered as a witness in any such action or proceeding shall be competent to testify as to sales of comparable land, including any improvements thereon. . . from information or knowledge of such sales, obtained from the owner, seller, purchaser, lessee or occupant of such comparable land, or from information obtained from the broker or brokers or attorney or attorneys who negotiated or who are familiar with or cognizant of such sales, which testimony when so offered, shall be competent and admissible evidence in any such action or proceeding.
>
> [N.J.S.A. 2A:83-1 (emphasis added).]

Here, the facts and data with respect to comparable sales 2, 3, and 5, upon which MTC's expert's sales comparison opinion of value is predicated, were not verified, confirmed, or corroborated with individuals possessing personal knowledge of or a familiarity with those sale

14

transactions. Rather, MTC's expert relied exclusively on information he gathered from CoStar listings and public records. Testimony revealed that MTC's expert did not confer with the seller, purchaser, attorneys for the seller or purchaser, or the listing or purchasing real estate brokers who negotiated and possessed first-hand knowledge of such sale transactions.

Because MTC's expert did not confer with or acquire information from individuals who participated in or were a party to the sales transactions identified as comparable sales 2, 3, and 5, MTC's expert was unable to discern whether the transactions were reliable indicators of fair market value. Thus, in accordance with N.J.S.A. 2A:83-1, the court excludes from consideration MTC's expert's comparable sales 2, 3, and 5.

b.  Comparability

When engaging in the sales comparison approach, similarities must exist between the subject property and the comparable properties. "Evidence of comparable sales is effective in determining value only where there is a substantial similarity between the properties." Venino v. Carlstadt Borough, 1 N.J. Tax 172, 175 (Tax 1980), aff'd o.b., 4 N.J. Tax 528 (App. Div. 1981). By definition comparability does not require properties to be identical, "differences between a comparable property and the subject property are anticipated. They are dealt with by adjustments recognizing and explaining these differences, and then relating the two properties to each other in a meaningful way so that an estimate of the value of one can be determined from the value of the other." U.S. Life Realty Corp. v. Jackson Twp., 9 N.J. Tax 66, 72 (Tax 1987). Thus, a fundamental predicate of the comparative approach requires evidence "be based on 'sound theory and objective data,' rather than on mere wishful thinking." MSGW Real Estate Fund, 18 N.J. Tax at 376 (quoting FMC Corp. v. Unmack, 92 N.Y. 2d 179, 188 (1998)). An appraiser must establish appropriate "elements of comparison for a given appraisal through market research and support those

15

conclusions with market evidence." The Appraisal of Real Estate at 390. Hence, the probative value of the comparable analysis hinges upon the similarities which can be drawn and the objective market data utilized to support adjustments thereto.

Here, effective cross-examination disclosed that the five comparable sale transactions identified by MTC's expert may not be comparable and reliable indicators of the subject property's true or fair market value. MTC's expert did not know or research whether the comparable sales identified have similar layouts, properties, or physical attributes. For instance, MTC's expert was unable to state whether any of the comparable sales had common/shared bathrooms or private bathrooms annexed to each unit. Moreover, MTC's expert did not know whether any of the comparable sales had guest lounge areas, like the subject property. Further, MTC's expert did not know whether any of the comparable sales had guest recreational facilities, like the subject property.

Additionally, MTC's expert did not review the occupancy agreements for any of the comparable sales and was unfamiliar with their terms, rates, and/or restrictions, and how those agreements compared with the occupancy provisions and rates charged to the subject property's guests. MTC's expert did not review or possess any information about the leases, rents, room rates, or gross revenues of any of the comparable sales, and did not know what role the leases, rents, room rates, or gross revenues played in determining their sale prices.

Further, the improvement existing on comparable sale 2 was demolished following the sale and a single-family residence constructed thereon.[14] Thus, the market dictated that the highest and

---

[14] MTC's expert was unsure whether the improvement was demolished or converted following the sale. The CoStar listing contained in the Addendum to MTC's expert's appraisal report states "13 Room Demolished Hotel Building Demolished." MTC's expert did not have any information about the demolition, did not know whether the demolition occurred prior to or after the sale, and did not know if the entire structure was demolished.

best use of comparable sale 2 was as a single-family residence, and not as a hotel. Accordingly, the sale price for comparable 2 is more indicative of the land value, and not the value of the land with the hotel. Further, comparable sale 4 contains four one-car garage spaces. Yet, MTC's expert did not know whether the garages were rented, whether they were included in the occupancy agreements for the tenants, or what the rental rate was for the four one-car garage spaces.

Moreover, the subject property is a hotel, and thus, is not required to be licensed by the New Jersey Department of Community Affairs. However, cross-examination disclosed that comparable sales 1 and 3 are operated as boarding houses/rooming houses (comparable sale 1 is operated as a gender-restricted boarding house) and are subject to licensure and inspection requirements of the New Jersey Department of Community Affairs.

Additionally, the subject property comprises a lot area of 1.244 acres, representing a size differential approximately: (i) 7.3 times larger than comparable sale 1; (ii) 2.7 times larger than comparable sale 2; (iii) 4.78 times larger than comparable sale 3; (iv) 7.775 times larger than comparable sale 4; and (v) 8.23 times smaller than comparable sale 5. However, MTC's expert applied no adjustments to account for these material lot area disparities. The court's review of the CoStar listings contained in the Addendum to MTC's expert's appraisal report discloses that the price, per acre of land, for each comparable sale is: (1) $4,760,530, comparable sale 1; (2) $1,824,221, comparable sale 2; (3) $2,729,384, comparable sale 3; (4) $2,020,202, comparable sale 4; and (5) $70,185, comparable sale 5. Yet, MTC's expert opined a value, per acre of land, for the subject property of $884,244 ($1,100,000/1.244 acres = $884,244). This amounts to less than half the value of the next closest property in lot size area (comparable sale 2). MTC's expert offered no explanation for this vast lot size discrepancy, nor material difference in value, per acre of land.

Finally, the subject property comprises 17,129 square feet, while MTC's expert's comparable sales ranged in size from 2,650 to 7,994 square feet. Thus, the comparable sales were between 2.14 and 6.46 times smaller than the subject property. MTC's expert offered no testimony explaining how the significant disparity that existed in improvement size impacted value. Moreover, he offered no insight or analysis of how hotel room size, may impact or influence the daily guest rates charged, and correspondingly, the gross revenue to be derived from hotel operations.

While none of the foregoing factors individually are necessarily dispositive on the issue of comparability, together they support a finding that MTC's expert's investigative efforts and selection of comparable sales lacks a measure of credibility and reliability.

c.   Adjustments

MTC's expert applied no adjustments to the comparable sales to account for differences in time, location, lot size, improvement size, or number of units. According to MTC's expert, nothing in his analysis revealed that adjustments for condition, time, or location were warranted.[15] Moreover, despite describing in his appraisal report the condition of the subject property as "Average," during trial MTC's expert declared that the subject property was in "poor" or "decrepit" condition. Notably, MTC's expert did not conduct an interior inspection of the subject property and reviewed only interior photographs provided to him by MTC. However, MTC's expert's appraisal report does not identify, and his testimony before the court did not explain what condition or conditions that he observed in the photographs rendering the subject property "poor" or "decrepit." Moreover, MTC's expert did not explain how many photographs he reviewed, who

_____

[15] MTC's expert did not state whether he considered adjustments for improvement size, lot size, or number of available units.

18

took the photographs, when the photographs were allegedly taken, or who advised him that the photographs accurately depicted the interior condition of the subject property.

Additionally, MTC's expert applied no condition adjustment to the comparable sales, finding the condition of each comparable sale "similar." In fact, during trial, MTC's expert offered that "from the [CoStar] pictures I saw they [the comparable sales] were in similar condition." However, MTC's expert offered no explanation of the similarities, or differences, he observed in these photographs. Importantly, no interior photographs of the subject property were contained in MTC's expert's appraisal report, nor were any offered during trial, and no interior photographs of any of the comparable sales were contained in MTC's expert's appraisal report, nor were any offered during trial. Thus, the court was unable to appropriately gauge the condition of the subject property as of the valuation dates at issue and was further unable to ascertain whether the comparable properties were in substantially similar condition to the subject property.

Moreover, MTC's expert applied a $25,000 upwards adjustment, per unit, to each comparable sale to account for what he perceived was the value attributable to the subject property's Carriage House. Stated differently, MTC's expert found that the Carriage House was an "accessory" on the subject property superior to that of the comparable sales. In MTC's expert's opinion, the Carriage House had a value of $320,000, which when divided by the thirteen units in the subject property equated to a $25,000 adjustment. MTC's expert then applied the $25,000 adjustment to the adjusted sales price, per unit, for each of the five comparable sales.

Importantly however, neither MTC's expert's appraisal report, nor his trial testimony provided any meaningful market derived evidence in support of the $25,000 adjustment. According to MTC's expert, he "took an income approach on . . . the Carriage House and came to a value of $320'ish thousand dollars." After dividing the $320,000 value he attributed to the

19

Carriage House by thirteen units, he arrived at his $25,000 adjustment per unit. Significantly however, no income capitalization analysis detailing the Carriage House's value is set forth or identified in MTC's expert's appraisal report. In response to cross-examination on this issue, MTC's expert submitted that "I can walk you through how I got there, I took the income, I took a vacancy and rent loss, I took an expense, and then I capped it out." Moreover, effective cross-examination disclosed that MTC's expert's analysis, computation, and application of his derived vacancy, collection loss factor, expenses, and capitalization rates for the Carriage House are not identified in the appraisal report.[16] According to MTC's expert, it "is not there, . . . it's not individually broken out in the [appraisal] report."

"Adjustments must have a foundation obtained from market-derived sources or objective data and not be based on subjective observations and/or personal experience." VBV Realty, LLC, 29 N.J. Tax at 571. An appraiser's adjustments "must have a foundation obtained from the market. . . ." Greenblatt, 26 N.J. Tax at 55. "[T]he opinion of an expert depends upon the facts and reasoning which form the basis of the opinion. Without explanation as to the basis, the opinion of the expert is entitled to little weight in this regard." Id. at 55. Here, MTC's expert failed to provide the "why and wherefore" in support of his $25,000 "accessory" adjustment. MTC's expert failed to identify any objective, market derived data upon which this adjustment was based. Moreover, neither MTC's expert's appraisal report, nor his trial testimony disclosed the substantive analysis undertaken for his derived vacancy, collection loss factor, expenses, and capitalization rates to

---

[16] The addendum to MTC's expert's appraisal report contains PwC reports for the "National Apartment Market," "National CBD (Central Business District) Office Market" and "National Suburban Office Market," and RERC Second-Tier and Third-Tier Investment Property reports for the "Apartment" and the "CBD" and "Suburban" office markets. However, MTC's expert offered no meaningful testimony that he consulted or employed those publications in deriving his vacancy and collection loss factors, expenses, or capitalization rates in attempting to discern the Carriage House's value, or how the published data compared with the figures that he employed.

discern the estimated $320,000 value he applied to the Carriage House. When the evidentiary foundation forming the basis of an expert's adjustment is not well-defined, the court cannot be expected to deduce a value therefrom. The weight to be accorded expert testimony relative to adjustments "depends upon the facts and reasoning which form the basis of the opinion. An expert's conclusion can rise no higher than the data providing the foundation." Inmar Associates v. Edison Twp., 2 N.J. Tax 59, 66 (Tax 1980) (citing Passaic v. Gera Mills, 55 N.J. Super. 73 (App. Div. 1959)). Consequently, without market evidence supporting MTC's expert's value conclusions for the Carriage House and corresponding adjustment for its "Accessory" value, the court is unable to conclude that the adjustment is reasonable and appropriately accounts for the value attributable to the Carriage House on the subject property.

### d. Other physical assets

Cross-examination further disclosed that MTC's expert undertook no analysis of comparable sales of Carriage Houses in the market and conducted no research of comparable sales of office space in the market. In attempting to rationalize the methods he employed to value the Carriage House under the sales comparison approach, MTC's expert acknowledged that, "there were many other ways that this [valuing the Carriage House] could be done, but this is the way that I chose to do it."

However, one of the key limitations of the sales comparison approach is that it can produce a less reliable result when the property to be appraised, or the sales transaction being evaluated, involve the presence of other physical assets or business interests. If an appraisal project or sales transaction involves multiple assets or improvements, it is incumbent upon the appraiser to dissect the property to be appraised or sales transaction into individual component parts. The appraiser must then attempt to ascribe a separate and independent value to each component. Because

21

employing the sales comparison approach to value a property with other physical assets or business interests involves assigning a separate value to each of those components, it "may be less reliable as an indicator of the subject property's value because of the complexity of the mix of factors involved." The Appraisal of Real Estate at 381.

For the reasons expressed above, the court finds MTC's expert's sales comparison approach flawed, not credible, and entitled to no weight.

2.     Income Capitalization Approach

When a property is income producing, the income capitalization approach is the favored method for determining the estimated value of that property. Parkway Village Apartments Co. v. Cranford Twp., 8 N.J. Tax 430 (Tax 1985), aff'd, 9 N.J. Tax 199 (App. Div. 1986), rev'd on other grounds, 108 N.J. 266 (1987); Helmsley v. Fort Lee Borough, 78 N.J. 200 (1978); Hull Junction Holding Corp. v. Princeton Borough, 16 N.J. Tax 68 (Tax 1996). "The income capitalization approach to value consists of methods, techniques, and mathematical procedures that an appraiser uses to analyze a property's capacity to generate benefits (i.e., usually the monetary benefits of income and reversion) and convert these benefits into an indication of present value." The Appraisal of Real Estate at 439.

There are two methods that may be used to derive the estimated value of an income producing property. One method, known as direct capitalization, converts "an estimate of a single year's income expectancy into an indication of value in one direct step, either by dividing the net income estimate by an appropriate capitalization rate or by multiplying the income estimate by an appropriate factor." The Appraisal of Real Estate at 491; Hull Junction Holding Corp., 16 N.J.

Tax at 80-81.[17]  Thus, the capitalization rate is the device that converts a property's net operating income into an estimate of value.

However, when the property owner is not receiving income from the rental of the real estate, but rather is generating income from the operation and management of a hotel, the direct capitalization technique is inappropriate.  In order to derive the value of a hotel under the income capitalization approach, an appraiser must segregate the income attributable to use of the real property, from the income that is generated by business operations of the hotel, before capitalization.  This technique is often referred to as the "Rushmore" approach.  Glenpointe Assocs. v. Teaneck, 10 N.J. Tax 380 (Tax 1989), aff'd, 12 N.J. Tax 118 (App. Div. 1990).  See also Prudential Ins. Co. v. Parsippany-Troy Hills Twp., 16 N.J. Tax 58 (Tax 1995), aff'd, 16 N.J. Tax 148 (App. Div. 1996); City of Atlantic City v. Ace Gaming, LLC, 23 N.J. Tax 70 (2006); Chesapeake Hotel LP v. Saddle Brook Twp., 22 N.J. Tax 525 (2005).

In attempting to justify use of the direct capitalization technique, MTC's expert characterized the subject property's guests as being "transient [in] nature," with "some daily users, some weekly users, and some monthly users and there was a mixed bag of that . . . it was really operated like an apartment building."  MTC's expert offered no further meaningful evidence to the court to delineate how MTC's operation of The Georgian Inn was akin to an apartment complex.  MTC's expert further pronounced that the subject property is "not a hotel, it's not a rooming house, it's not an apartment building, but it's operated . . . like an apartment building."  Thus, in MTC's expert's opinion, the "primary approach, which purchasers would look at in the purchase of a hotel like the subject property," is the income capitalization approach (emphasis added).  Accordingly,

---

[17] The other method, known as yield capitalization, focuses on income forecasting and a property's anticipated cash flow over a defined holding period.

23

MTC's expert attempted to derive a value for the subject property's hotel employing the direct capitalization technique, treating it like an apartment complex.

In employing the direct capitalization technique, MTC's expert accepted The Georgian Inn's annual reported hotel gross revenues of $231,254, for the 2013 tax year, and of $200,025, for the 2014 tax year.[18] MTC's expert then identified five office leases in Essex County entered into between May 2012 and May 2014, that he found comparable to the subject property's Carriage House. MTC's expert was unable to verify the rental amount or lease terms with respect to two of the office leases identified in his appraisal report instead, relying exclusively on the information reported by CoStar listings.[19] The leases were either gross or modified gross leases, ranged in rental rate from $12.00 to $17.79, per square foot, and ranged in leased area from 275 to 3,050 square feet. MTC's expert applied no adjustments to any of the office leases for time, lease type, leased area, or location. MTC's expert ultimately concluded a market rent of $16.00, per square foot, for the Carriage House offices as of the October 1, 2013, and October 1, 2014 valuation dates. MTC's expert then added an annual rent of $42,400 (2,650 sq. ft. x $16.00 = $42,400), which he attributed to the Carriage House, to The Georgian Inn's annual hotel revenues to derive a potential gross income of $273,654, as of the October 1, 2013 valuation date, and $254,125, as of the October 1, 2014 valuation date.[20]

---

[18] During trial, MTC's expert explained that The Georgian Inn's annual hotel revenues for the 2014 tax year was misstated in his appraisal report as $211,725 and should be amended to $200,025.

[19] The income capitalization approach requires an appraiser to "[r]esearch the income and expense data for the subject property and comparables." The Appraisal of Real Estate at 460.

[20] During trial, MTC's expert explained that attributing an annual rent to the Carriage House, as of the October 1, 2014 valuation date was in error, as a result of the fire that occurred on March 9, 2014, rendering it uninhabitable. MTC's expert offered that the annual rent attributable to the Carriage House, as of the October 1, 2014 valuation date, should be amended to $0.00.

24

MTC's expert then applied a vacancy and collection loss factor of 5% to his derived potential gross income to calculate an effective gross income of $259,971, as of the October 1, 2013 valuation date, and $190,023, as of the October 1, 2014 valuation date. MTC's expert then applied expenses for: (i) management, 5%; (ii) administration, 2%; (iii) utilities, 24.48%; (iv) maintenance and repairs, 8%; (v) insurance, 7.24%; (vi) miscellaneous, 1%; and (vii) replacement reserves, 2%. After applying the foregoing expenses to the effective gross income, the estimated net operating income remaining was $123,935, as of the October 1, 2013 valuation date, and $95,563, as of the October 1, 2014 valuation date.[21]

After examining data from a number of national and regional published investor surveys for apartment complexes and offices,[22] MTC's expert employed the band of investment technique to derive his capitalization rates.[23] Ultimately, MTC's expert determined an overall capitalization rate of: (i) 7.60%, as of the October 1, 2013 valuation date; and (ii) 7.35%, as of the October 1, 2014 valuation date. MTC's expert then applied the capitalization rates to his computation of the subject property's net operating income to reach his conclusions of value.

However, the court finds that MTC's expert's testimony and attempts to characterize The Georgian Inn as being operated like an apartment complex and not as a hotel directly contradict

---

[21] Again, during trial, MTC's expert explained that his computation of the subject property's net operating income, as of the October 1, 2014 valuation date, identified in his appraisal report was erroneously reported as $115,091 and should be amended to $95,563.

[22] ACLI Apartment Investment Bulletin, ACLI Office Investment Bulletin, PwC Korpacz National Apartment Institutional Grade, PwC Korpacz National Apartment Non-Institutional Grade, PwC Korpacz National CBD Office Institutional Grade, PwC Korpacz National CBD Office Non-Institutional Grade, PwC Korpacz National Suburban Office Institutional Grade, PwC Korpacz National Suburban Office Non-Institutional Grade, RERC East Second Tier Apartment, RERC Third Tier Apartment, RERC East Second Tier CBD Office, RERC East Second Tier Suburban Office, RERC East Third Tier CBD Office, RERC East Third Tier Suburban Office, and RealtyRates.com.

[23] The band of investment technique involves consideration and weighting of debt and equity components of an investment to discern an overall capitalization rate.

25

the factual findings contained in his appraisal report, and in the pre-trial discovery exchanged between MTC and Montclair Township. MTC's expert's appraisal report states that: (i) use of the subject property as a "hotel and office" is not a permitted use in the R3 zone (page 15); (ii) the subject property comprises a "13 unit hotel" (page 20); (iii) the subject property's style is a "hotel" (page 26); (iv) the subject property generated "Hotel income" during the 2013 and 2014 tax years (page 29); and (v) the subject property generated "Hotel & Apartment [Potential Gross] Income" as of the October 1, 2013 and October 1, 2014 valuation dates (page 30). MTC's expert's characterization is also inconsistent with the Answers to Interrogatories furnished by MTC to Montclair Township reciting that: (i) "[t]he subject property . . . consists of a two and one half (2.5) story, Thirteen (13) room hotel" (Interrogatory 4); (ii) "[t[he subject property is used as a hotel" (Interrogatory 5); (iii) "17,129 +/- square feet devoted to hotel use" (Interrogatory 6(g)); (iii) "[t]hirteen (13) hotel rooms (Interrogatory 6(i)); (iv) "[t]he subject property is not used as a residential apartment building" (Interrogatory 7) (emphasis added); (v) "[t]he subject property is a hotel" (Interrogatory 11); and (vi) "[d]uring the year of appeal or the preceding two (2) years, the subject property . . . has NOT been offered for lease" (Interrogatory 14).

Additionally, cross-examination and the court's review of MTC's "Profit & Loss" statements for the 2013 and 2014 tax years offered into evidence during trial disclose that MTC remitted Sales and Use Taxes, and Occupancy Fee Taxes on account of The Georgian Inn guests to the State of New Jersey.[24] Accordingly, as of the valuation dates at issue, MTC reported to the

---

[24] Under the New Jersey Sales and Use Tax Act, N.J.S.A. 54:32B-1 to 54:32B-55,"[p]ersons required to collect tax" include "every vendor of tangible personal property or services; . . . and every operator of a hotel. . . ." N.J.S.A. 54:32B-2(w) (emphasis added). Moreover, the New Jersey Sales and Use Tax Act defines a "customer" to include "every purchaser of tangible personal property or services; . . . and every occupant of a room or rooms in a hotel." N.J.S.A. 54:32B-2(x) (emphasis added). Additionally, "current law extends similar tax treatment to transient accommodations, which were not previously subject to tax . . . New Jersey property owners who

26

State of New Jersey Sales and Use Taxes and Occupancy Fee Taxes derived from operation of the subject property as a hotel. Had MTC held the subject property out as, and operated it like an apartment complex, as MTC's expert suggested, Sales and Use Taxes and Occupancy Fee Taxes would not have been imposed.

Moreover, the attachments to MTC's Answers to Interrogatories categorize each of their guests as having "Reservations," including reservations that were "Cancelled," for which refunds were issued. Thus, had MTC considered its guests as tenants and operated The Georgian Inn as an apartment complex, the court finds that MTC would have more accurately classified their monthly revenues as rent rolls, and not as reservations. Additionally, although The Georgian Inn's monthly "Receipts" ledger classified amounts received from approximately two guests as "Non Taxable," MTC's expert was unable to meaningfully explain to the court why the amounts received from these guests were assigned such designation and how the occupancy of these guests differed from the occupancies of the other hotel guests.

Finally, MTC's expert was wholly unfamiliar with the hotel occupancy agreements entered into with The Georgian Inn's guests. In order to accurately gauge whether The Georgian Inn was truly being operated like an apartment complex, it was incumbent upon MTC's expert to conduct an investigation and analysis of those agreements to discern whether they were tantamount to leases. It is well-settled that "[a]n appraiser begins the income capitalization approach by

---

provide transient accommodations are now required to collect and remit New Jersey Sales Tax, the State Occupancy Fee, . . ." New Jersey Division of Taxation, New Jersey Sales Tax Guide, Tax Topic Bulletin S&U-4 (Rev. 10/20). Further, an "Occupancy Fee of 5% is imposed on the rent for every occupancy of a room in a hotel, motel, and transient accommodations such as short-term rentals of rooms, homes or other lodging or similar facility in most New Jersey municipalities." Ibid.

analyzing existing and proposed leases that apply to the subject property." The Appraisal of Real Estate at 444.

Accordingly, the court finds MTC's expert's conclusion that the subject property was operated as an apartment building is without adequate factual support in the record. Thus, the court concludes that MTC's expert's use of the direct capitalization technique to derive an opinion of market value of the subject property was misplaced and not reliable. The court finds that failing to employ the Rushmore method, which involves segregating the income attributable to use of the real property, from the income that is generated by the business operations of the hotel, before capitalization, results in an inaccurate conclusion of value.

For the above-stated reasons, the court finds MTC's expert's income capitalization approach is not credible and entitled to no weight.

C.    Subject sale

In establishing the true or market value of real property for local property tax purposes, "[t]he search, of course, is for the fair value of the property, the price a willing buyer would pay a willing seller." Glen Wall Assocs. v. Wall Twp., 99 N.J. 265, 281-82 (1985) (quoting City of New Brunswick v. State Div. of Tax Appeals, 39 N.J. 537, 543 (1963)). Market value is defined as

> [t]he most probable price that the specified property interest should sell for in a competitive market after a reasonable exposure time, as of a specified date, in cash, or in terms equivalent to cash, under all conditions requisite to a fair sale, with the buyer and seller each acting prudently, knowledgeably, for self-interest, and assuming that neither is under duress.
>
> [The Dictionary of Real Estate Appraisal at 122.]

In general, the goal of the seller is "to maximize price, while a buyer wants to minimize it. Therefore, it is well settled that a bona fide sale of property may be indicative of the true value of the property." Glen Wall Assocs., 99 N.J. at 282. However, the fact that a property has sold a

28

certain price is not necessarily "dispositive on the issue of value . . . there may be instances when the sale price may not reflect true value. In such instances it is for the court to appraise the circumstances surrounding a sale to determine if there were special factors which affected the sale price without affecting the true value." Ibid.

In discerning whether a sales transaction represents a reliable indicator of market value, the court must consider and analyze the following criteria: (i) whether the buyer or the seller were unusually motivated, (ii) whether the buyer and seller were well-advised and acting prudently, (iii) the length of time that the property was exposed to an open and competitive marketplace, (iv) whether the purchase price was paid in cash, and (v) whether the purchase price was affected by special or creative financing. Venture 17, LLC v. Hasbrouck Heights Bor., 27 N.J. Tax 108, 126 (Tax 2013) (citing Hull Junction Holding Corp. v. Princeton Bor., 16 N.J. Tax 68, 94 (Tax 1996)).

In addition to the foregoing analysis, the court must consider the remoteness of the sale transaction. "The benefit of the comparison is lost if the effects of time have altered the factors which result in a determination of value. Our courts have considered the issue of remoteness." Glen Wall Assocs., 99 N.J. at 282 (citing Rek Investment Co. v. Newark, 80 N.J. Super. 552, 560 (App. Div. 1963); Samuel Hird & Sons, Inc. v. Garfield, 87 N.J. Super. 65, 70-71 (App. Div. 1965); Almax Builders, Inc. v. Perth Amboy, 1 N.J. Tax 31, 37 (Tax 1980)).

Moreover, during trial the taxing district is afforded the opportunity to cross-examine the witnesses on the accuracy and propriety of the sale and to present evidence demonstrating that a sale was impacted by unique circumstances, influenced by special financing consideration, was "not made at arm's length, was a distress sale, or was a sham." Ibid.

Here, the subject property sold on September 17, 2012, for reported consideration of $1,561,000. According to MTC's expert, he conferred with MTC's principal member, Steven D.

Plofker, regarding the sale and "determined that it was an open, arms-length transaction, the property had been on the market for many years, and this was an arms-length market transaction." MTC's expert further offered testimony that in confirming the subject property's sale was arms-length, he reviewed the September 17, 2012 Deed, Affidavit of Consideration, and HUD-1 Uniform Settlement Statement. A copy of the September 17, 2012 Deed, Affidavit of Consideration, and HUD-1 Uniform Settlement Statement reviewed by MTC's expert were offered into evidence.

The court highlights that although the Deed, Seller's Affidavit of Consideration and lines 101 and 401 of the HUD-1 Uniform Settlement Statement reflect a sale price of $1,561,000, the court's review of line 700 of the HUD-1 Uniform Settlement Statement reflects that the sales/broker's commission was based on a sale price of $2,030,000. However, the court's review of the HUD-1 Uniform Settlement Statement does not reveal that any sales/broker's commission was paid from the seller's proceeds at the closing.

Nonetheless, this evidence must be considered together with MTC's expert's testimony during trial that in evaluating the sale he reviewed the subject property's "listing." Although MTC's expert was unable to recall the original listing price and was unable to identify the subject property's alleged listing from the Garden State Multiple Listing Service, LLC website,[25] MTC's expert testified that he reviewed the subject property's "listing" on both LoopNet and CoStar.[26] In general, the term "listing" in the real property sales and valuation community is recognized as a

---

[25] The Garden State Multiple Listing Service, LLC is a fee based property multiple listing service available to participating real estate brokers advertising and marketing "residential, multi-family, commercial/industrial and business" properties for sale in various northern New Jersey counties, including, Bergen, Essex, Hudson, Hunterdon, Middlesex, Morris, Passaic, Somerset, Sussex, Union and Warren. https://www2.gsmls.com/publicsite/index.jsp. (last visited March 22, 2021.)
[26] The subject property's LoopNet and CoStar listings were not annexed to MTC's expert's appraisal report, were not identified during trial, and were not offered into evidence.

30

"written contract in which an owner employs a broker to sell his or real estate. The act or process of making a property available for sale." The Dictionary of Real Estate Appraisal 116.

Thus, if the court interprets MTC's expert's testimony that listing the subject property for sale means that it was offered for sale by a licensed real estate salesperson or broker, together with the evidence that the HUD-1 Uniform Settlement Statement reflects the sales/broker's commission was based on a sale price of $2,030,000, then it would appear that such real estate salesperson may have been compensated separate and apart from the $1,561,000 reported Deed price. If so, the $1,561,000 Deed price would not accurately represent the true or market value of the subject property. Rather, if the real estate salesperson was compensated based on the $2,030,000 figure reported on the HUD-1 Uniform Settlement Statement, than that figure may be more representative of the subject property's true or fair market value.

Conversely, if the court interprets MTC's expert's testimony to mean only that the subject property was made available for sale by the owner, and that no licensed real estate salesperson or broker was involved in the transaction, then the court has no evidence whether the subject property was exposed to an open and competitive market. See Venture 17, LLC, 27 N.J. Tax at 126 (citing Hull Junction Holding Corp., 16 N.J. Tax at 94) (concluding that "[t]he sale of property is a reliable indicator of fair market value if the following criteria are satisfied: . . . the property has been reasonably exposed to an open, relevant and competitive market for a reasonable period of time; . . . .") Here, MTC's expert offered no testimony regarding what efforts were undertaken by the seller to market the subject property for sale or how MTC learned that the subject property was available for sale if it was not being actively marketed and advertised for sale by a licensed real estate salesperson or broker. Accordingly, if the subject property was not exposed to an open and

31

competitive market, then its sale price is not necessarily a reliable indicator of true or fair market value.

In sum, the court is left with more questions and uncertainties regarding the subject property's sale than it has adequate and reliable answers. Based on the limited testimony and contradictory evidence offered during trial regarding the subject property's sale price, and the sale price upon which the broker's commission was calculated, the court is unable to conclude by a fair preponderance of the evidence that the subject property's September 17, 2012, sale is dispositive on the issue of the subject property's true or fair market value.

Nonetheless, the court is mindful of its obligation "to apply its own judgment to valuation data submitted by experts in order to arrive at a true value and find an assessment for the years in question." Glen Wall Associates, 99 N.J. at 280 (citing New Cumberland Corp. v. Roselle Borough, 3 N.J. Tax, 345, 353 (Tax 1981)). However, to enable the court to make an independent finding of true value, credible and competent evidence must be adduced in the trial record.

Here, the court's consideration of MTC's expert's testimony and the appraisal report upon which it is premised, reveals numerous inconsistencies, omissions, errors, and material issues of credibility, rendering his conclusions of dubious value. As detailed above, the court found MTC's expert's sales comparison approach contained sales that were not adequately investigated and contained disparate physical properties, contained an unsupported adjustment for the Carriage House, and a lack of market derived evidence. Moreover, his income capitalization approach was premised on valuing the subject property as an apartment building, despite the evidence at trial revealing that it was being operated as a hotel. Finally, the subject property's sales documents reveal material inconsistencies between the reported Deed price and the price upon which the

sales/broker's commission was calculated.  Hence, without reliable and credible evidence of value, the court is unable to discern the subject property's true or fair market value.

The court's independent determination of value must be based "on the evidence before it and the data that are properly at its disposal."  F.M.C. Stores Co. v. Morris Plains Borough, 100 N.J. 418, 430 (1985).  The court concludes that based on MTC's expert's testimony and appraisal report, the trial record contains insufficient credible information to enable the court to make a reliable independent finding of the subject property's true value as of the October 1, 2013, and October 1, 2014 valuation dates.

Accordingly, for the above stated reasons, the court will enter judgments affirming the subject property's 2014 and 2015 local property tax assessments.

Very truly yours,


Hon. Joshua D. Novin, J.T.C.